# United States Court of Appeals
## For the First Circuit

Nos. 04-1801
     04-2291

RUBEN CARNERO,

Plaintiff, Appellant,

v.

BOSTON SCIENTIFIC CORPORATION,

Defendant, Appellee.

APPEALS FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Rya W. Zobel, U.S. District Judge]

Before

Boudin, Chief Judge,
Campbell and Cyr, Senior Circuit Judges.

Edward Griffith, with whom Silvia Bolatti and Bolatti & Griffith were on brief for appellant.
James W. Nagle, with whom Leslie S. Blickenstaff and Goodwin Procter LLP were on brief for appellee.

January 5, 2006

**CAMPBELL**, <u>Senior Circuit Judge</u>.  Plaintiff-appellant Ruben Carnero ("Carnero") appeals from judgments of the United States District Court for the District of Massachusetts dismissing his federal and state law complaints against Boston Scientific Corporation ("BSC").  Both complaints alleged that BSC had terminated him in retaliation for "whistleblowing" -- for telling BSC that Latin American subsidiaries had created false invoices and had inflated sales figures.  The district court determined that Carnero, an Argentinian citizen resident in Brazil who worked for the two BSC subsidiaries and whose whistleblowing pertained to their alleged improprieties in Latin America, could not sue BSC under the whistleblower protection provision contained in Title VIII, Section 806, of the Sarbanes-Oxley Act of 2002, 18 U.S.C. § 1514A (2005).  In the district court's view, that provision is without extraterritorial effect.  The court also held that Carnero could not pursue state law claims against BSC as he "had no contact with the defendant in Massachusetts" and as defendant did not "in any way direct or control" his employment.  For the reasons discussed below, we affirm.

## I.  Background

As said, Carnero is a citizen of Argentina and currently resides in Brazil.  The defendant, BSC, is a Delaware corporation with headquarters in Natick, Massachusetts.  BSC manufactures

-2-

medical equipment and has operations in many countries throughout the world.

In 1997, Carnero, while residing in Argentina, accepted employment with a BSC subsidiary in Argentina, Boston Scientific Argentina S.A. ("BSA"), an Argentinian company. His employment agreement, entered into in Argentina although negotiated in various countries including the United States, provided that his place of work was BSA's headquarters (which is in Buenos Aires), that he would be paid in pesos, and that the employment agreement was governed by the laws of Argentina. Carnero initially worked for BSA as Country Manager for Argentina and then served as the Latin America Business Development Director. In 2001, he took an assignment as Country Manager for a Brazilian subsidiary of BSC, Boston Scientific Do Brasil Ltda. ("BSB"), while still employed by BSA. Carnero asserts that he was terminated from BSB in August 2002, and from BSA in April 2003, in retaliation for reporting to supervisors at BSC that BSC's Argentinian and Brazilian companies, as well as other foreign companies, were engaged in accounting misconduct by, inter alia, improperly inflating sales figures.

It is undisputed that Carnero was directly employed and paid by BSC's Argentinian and Brazilian subsidiaries rather than by BSC itself. It is also undisputed that the alleged fraudulent conduct reported by Carnero was instituted in Latin America. But Carnero also asserts he had an overarching employment relationship

-3-

with the United States parent, BSC, resulting from the extensive and continuous control BSC's own Massachusetts employees allegedly exercised over his work and duties in Latin America. He says that he maintained contact with BSC, traveling frequently to Massachusetts to meet with supervisors there. Carnero does not dispute, however, that his employment duties were mainly performed outside of the United States, nor that his immediate employers were the two foreign subsidiaries.

In April 2003, Carnero pursued a "conciliation proceeding" in Argentina, a prerequisite to filing suit in an Argentinian court for statutory termination benefits from BSC and BSA. Argentinian employees terminated without cause are entitled to such benefits. An Argentinian mediator held a hearing with BSC, BSA and Carnero, but a settlement could not be reached. On June 20, 2003, BSC and BSA brought their own claims in the Argentinian court, alleging, inter alia, defamation based on Carnero's claims of billing irregularities. On June 23, 2003, the Argentinian court denied a preliminary injunction, finding that Carnero's claims of "operating irregularities" had not been shown to be false or publicized to third parties. The Argentinian action appears to be ongoing.

On July 2, 2003, Carnero filed a complaint against BSC with the United States Department of Labor ("DOL") pursuant to the whistleblower protection provision contained in Title VIII, Section

-4-

806, of the Sarbanes-Oxley Act of 2002. 18 U.S.C. § 1514A(b)(1)(A) (providing for filing of complaint with the United States Secretary of Labor).[1] On August 8, 2003, Carnero filed a complaint against BSC in the United States District Court for the District of Massachusetts based on diversity of citizenship under 28 U.S.C. § 1332(a)(2) (1993 & Supp. 2005), asserting state law claims, including breach of contract and retaliatory termination.

On December 19, 2003, the DOL issued a preliminary decision dismissing Carnero's Sarbanes-Oxley whistleblower claim. The DOL found that BSC was covered by the Sarbanes-Oxley whistleblower provision because it is a publicly traded company on the New York Stock Exchange. The DOL ruled, however, that the whistleblower protection provision of the Act did not apply to employees of covered companies working outside of the United States. Carnero v. Boston Scientific Corp., 2004-SOX-22 (OSHA Reg'l Adm'r) (Dec. 19, 2003) (citing Foley Bros., Inc. v. Filardo, 336 U.S. 281, 285 (1949) (noting that it is well settled that "legislation of Congress, unless a contrary intent appears, is

---

[1]The Secretary of Labor has delegated her responsibility for receiving and investigating whistleblower complaints to the Occupational Safety and Health Administration ("OSHA"), an agency within the DOL. Secretary's Order 5-2002; Delegation of Authority and Assignment of Responsibility to the Assistant Secretary for Occupational Safety and Health, 67 Fed. Reg. 65008-01, 65008, 2002 WL 31358967 (Oct. 22, 2002); see 29 C.F.R. § 1980.103(c) (2005). For convenience, we will frequently refer to the Secretary and OSHA as the DOL.

meant to apply only within the territorial jurisdiction of the United States")). Carnero then filed a complaint in the United States District Court for the District of Massachusetts on January 7, 2004, seeking de novo judicial review of his Sarbanes-Oxley whistleblower claim. See 18 U.S.C. § 1514A(b)(1)(B) (providing that claimant may bring federal court action if Secretary of Labor has not issued final decision within 180 days of filing of complaint and there is no showing that delay is due to claimant's bad faith).[2] Both of Carnero's district court complaints sought his reinstatement, among other relief.

BSC moved to dismiss both complaints. On March 25, 2004, the district court dismissed Carnero's state law claims, finding that Carnero "had no contact with the defendant in Massachusetts" and that defendant did not "in any way direct or control" his employment. Carnero v. Boston Scientific Corp., No. 03-11479-RWZ (D. Mass.) (Mar. 25, 2004 endorsed order). The court subsequently denied both Carnero's motion for reconsideration pursuant to Fed. R. Civ. P. 59(e) and his motion to consolidate the state law action with the federal law action pursuant to Fed. R. Civ. P. 42(a). Id. (May 13, 2004 endorsed order). On August 27, 2004, the court dismissed Carnero's claim brought under the whistleblower

_____

[2]Carnero also filed objections to the DOL's preliminary findings. The DOL issued a final decision dismissing the complaint because of the pending court action.

protection provision of the Sarbanes-Oxley Act, after examining the language and legislative history of the law. Carnero v. Boston Scientific Corp., No. 04-10031-RWZ, 2004 WL 1922132 (D. Mass. Aug. 27, 2004) (citing Foley Bros., 336 U.S. at 285-86). The court agreed with the DOL's preliminary determination that "[n]othing in Section 1514A(a) remotely suggests that Congress intended it to apply outside of the United States." Id. at *2. Carnero appeals from these rulings.

## II. The Federal Claim

We turn first to the dismissal of Carnero's complaint brought under the whistleblower protection statute, 18 U.S.C. § 1514A, of the Sarbanes-Oxley Act. Insofar as we know, no court has yet determined if this provision protects foreign citizens working outside of the United States for foreign subsidiaries of covered companies. The interpretation of a statute engenders our de novo review. Bonano v. E. Caribbean Airline Corp., 365 F.3d 81, 83 (1st Cir. 2004).

As noted, Carnero initially filed a complaint against BSC (the parent U.S. company) with the United States Department of Labor pursuant to 18 U.S.C. § 1514A(b)(1)(A). The DOL, acting through its agency, OSHA, rejected this in a preliminary report, on the ground that the whistleblower protection statute did not protect employees of covered companies working outside of the United States. Carnero v. Boston Scientific Corp., 2004-SOX-22

(OSHA Reg' Adm'r) (Dec. 19, 2003), supra. No final agency report having issued within 180 days, Carnero brought a similar complaint against BSC in the United States District Court for the District of Massachusetts, seeking, under the provisions of the statute, de novo judicial review of his whistleblower claim. See 18 U.S.C. § 1514A(b)(1)(B). In its dismissal of that action, the district court echoed OSHA's prior view that the whistleblower protection provision of the Sarbanes-Oxley Act does not apply outside of the United States. See supra.

A. Whether Carnero's Claim -- Apart from the Question of Extraterritoriality -- Fits otherwise within the Terms of the Whistleblower Protection Provision

Before proceeding to ask whether the instant whistleblower protection provision of the Sarbanes-Oxley Act was meant by Congress to provide extraterritorial relief, it is sensible to ask whether Carnero's claim is of the kind that would, if arising domestically, fit within that provision's language. If not, little need would exist to explore the extraterritorial issue. We conclude as an initial matter, without deciding finally, that Carnero's claim would -- putting aside the issue of extraterritoriality -- fit generally within the whistleblower protection provision of 18 U.S.C. § 1514A.

The whistleblower protection provision codified in 18 U.S.C. § 1514A is a relatively small part of the Sarbanes-Oxley Act which is composed of many separate statutes and statutory schemes

-8-

aimed at achieving the Act's investor-protection goals. The instant whistleblower protection statute creates an administrative complaint procedure and, ultimately a federal civil cause of action, designed to protect the "employees of publicly traded companies" who lawfully "provide information . . . or otherwise assist in an investigation regarding any conduct which the employee believes constitutes a violation" of the federal mail, wire, bank, or securities fraud statutes, any rule or regulation of the Securities and Exchange Commission ("SEC"), or other provision of the Federal law relating to fraud against the shareholders. 18 U.S.C. § 1514A(a).[3]

---

[3]18 U.S.C. § 1514A(a) provides:

Whistleblower protection for employees of publicly traded companies.--No company with a class of securities registered under section 12 of the Securities Exchange Act of 1934 (15 U.S.C. § 78l), or that is required to file reports under section 15(d) of the Securities Exchange Act of 1934 (15 U.S.C. § 78o(d)), or any officer, employee, contractor, subcontractor, or agent of such company, may discharge, demote, suspend, threaten, harass, or in any other manner discriminate against an employee in the terms and conditions of employment because of any lawful act done by the employee--

(1) to provide information, cause information to be provided, or otherwise assist in an investigation regarding any conduct which the employee reasonably believes constitutes a violation of section 1341, 1343, 1344, or 1348, any rule or regulation of the Securities and Exchange Commission, or any provision of Federal law relating to fraud against shareholders . . . ; or

(2) to file, cause to be filed, testify, participate

An individual complaining under this section of the Act must, therefore, ordinarily be -- as Carnero alleges he is -- an "employee" of a publicly traded company subject to the Act. Id.[4] BSC is a publicly traded company listed on the New York Stock Exchange although its two foreign subsidiaries, BSA and BSB, for which Carnero directly worked, are not. Companies subject to the Act are those "with a class of securities registered under section 12 of the Securities Exchange Act of 1934 (15 U.S.C. § 78l)" or "required to file reports under section 15(d) of the Securities Exchange Act of 1934 (15 U.S.C. § 78o(d))." Id. These registration and reporting provisions apply to U.S. and foreign companies listed on U.S. securities exchanges. See, e.g., Pinker v. Roche Holdings Ltd., 292 F.3d 361, 367 (3d Cir. 2002) (noting that foreign securities listed on U.S. securities exchanges must abide by the Exchange Act's registration and reporting requirements);[5] see also http://www.sec.gov/divisions/corpfin/

---

in, or otherwise assist in a proceeding filed or about to be filed (with any knowledge of the employer) relating to an alleged violation [of the above].

[4]18 U.S.C. § 1514A(b), the enforcement provision, allows a "person" who alleges discharge or discrimination in violation of subsection (a) to seek relief. Id. § 1514A(b)(1).

[5]15 U.S.C. § 78l(g)(3) (1997) allows the SEC to exempt from that subsection "any security of a foreign issuer . . . if the Commission finds that such exemption is in the public interest and is consistent with the protection of investors." Also, 15 U.S.C. § 78o(d) (1997) provides that "[n]othing in this subsection shall apply to securities issued by a foreign government or political

internatl/geographic.htm (listing more than one thousand foreign companies registered and reporting with the SEC as of Dec. 31, 2003).

As noted, Carnero was directly in the employ of BSC's foreign subsidiaries, BSA and BSB, not themselves listed foreign companies. He claims, however, that supervision by U.S. headquarters personnel of the parent made him an employee of BSC also. Moreover, apart from that, the fact that he was employed by BSC's subsidiaries may be enough to make him a BSC "employee" for purposes of seeking relief under the whistleblower statute. The DOL regulations pertaining to the whistleblower provision of the Sarbanes-Oxley Act define "employee" as someone "presently or formerly working for a [publicly-traded] company or company representative" (emphasis supplied). The latter term is defined as including a "contractor . . . or agent of a company." See 29 C.F.R. § 1980.101 (2005). If BSA and BSB were agents of BSC, as seems quite possible, their own employee would fit this definition of the parent's "employee." Hence Carnero, by virtue either of his own asserted contacts with BSC or his direct employment by its subsidiaries, or both, may well be an "employee" of BSC for purposes of 18 U.S.C. § 1514A. Neither party, indeed, contests that Carnero was a covered employee of BSC for purposes of seeking whistleblower relief under Sarbanes-Oxley. See Collins v. Beazer

---

subdivision thereof."

-11-

Homes USA, Inc., 334 F. Supp. 2d 1365, 1373 n.7 (N.D. Ga. 2004) (holding that employee of subsidiary is covered "employee" within meaning of 18 U.S.C. § 1514A where officers of publicly traded parent company have authority to affect employment of subsidiary's employees); Morefield v. Exelon Servs., Inc., 2002-SOX-2 (ALJ) (Jan. 28, 2004) (holding that "subsidiaries, for Sarbanes-Oxley purposes, are more than mere agents like an outside auditor or consultant . . . [they] are an integral part of the publicly traded company"). We shall, therefore, assume for present purposes, but without deciding, that Carnero was a covered employee of BSC. We shall also assume, for purposes of this appeal, again without deciding, that there is evidence that Carnero's employment was terminated in retaliation for conduct protected against by 18 U.S.C. § 1514A.

The whistleblower statute also makes clear that the misconduct it protects against is not only that of the publicly traded company itself, but also that of "any officer, employee, contractor, subcontractor, or agent of such company," who retaliates or otherwise discriminates against the whistleblowing employee. See 18 U.S.C. § 1514A(a). Thus, the statute can be read to embrace an agent-subsidiary's retaliation against a protected employee. As Carnero may be an "employee" of BSC, supra, his alleged retaliatory discharge by its subsidiaries for reasons forbidden in the Act could (putting aside any question of

-12-

extraterritorial application) violate the terms of the whistleblower protection provision of the Sarbanes-Oxley Act.

We conclude, therefore, that if Carnero's whistleblowing had occurred in this country relative to similar alleged domestic misconduct by domestic subsidiaries, he might well have a potential claim under the whistleblower protection provision of the Sarbanes-Oxley Act. This being so, we proceed to the next question, whether the whistleblower provision of the Act has extraterritorial effect, so that a foreign employee such as Carnero who complains of misconduct abroad by overseas subsidiaries, may bring suit under the whistleblower provision of Sarbanes-Oxley against the listed United States parent company. We think not.

B. The Presumption Against Extraterritorial Application

Carnero argues that the whistleblower protection statute, 18 U.S.C. § 1514A, should be given extraterritorial effect, so as to allow him to pursue in federal court his whistleblower claim brought under its provisions. He says his claim not only fits within the literal language of the statute, supra, but that to limit the operation of the statute to purely domestic conduct in the United States would improperly insulate the foreign operations of covered companies. This, he says, would frustrate the basic purpose of the Sarbanes-Oxley Act of which the whistleblower protection statute at issue is a part, to protect both the

investors in U.S. securities markets and the integrity of those markets.

While Carnero's argument has some force, it faces a high and we think insurmountable hurdle in the well-established presumption against the extraterritorial application of Congressional statutes.  Where, as here, a statute is silent as to its territorial reach, and no contrary congressional intent clearly appears, there is generally a presumption against its extraterritorial application.  E.E.O.C. v. Arabian Am. Oil Co., 499 U.S. 244, 248 (1991) ("Aramco") ("It is a longstanding principle of American law 'that legislation of Congress, unless a contrary intent appears, is meant to apply only within the territorial jurisdiction of the United States.'") (quoting Foley Bros., 336 U.S. at 285); see also Small v. United States, 125 S. Ct. 1752, 1755 (2005) (recognizing that presumption is alive and well).  In the present case, whatever help to investors its overseas application might in theory provide is offset not only by the absence of any indication that Congress contemplated extraterritoriality but by a variety of indications that Congress thought the statute was limited to the territorial jurisdiction of the United States.

The Supreme Court stated in Aramco that a court is to assume that Congress legislates with an awareness of the presumption against extraterritorial application.  499 U.S. at 248.

Thus, the presumption can be overcome only if there is an "'affirmative intention of the Congress clearly expressed.'" Id., (quoting Benz v. Compania Naviera Hidalgo, S.A., 353 U.S. 138, 147 (1957)); see Smith v. United States, 507 U.S. 197, 204 (1993) (requiring "clear evidence of congressional intent" to apply statute extraterritorially). In searching for clear evidence of Congress's intent, courts consider "all available evidence" about the meaning of the statute, including its text, context, structure, and legislative history. Cf. Sale v. Haitian Ctrs. Council, Inc., 509 U.S. 155, 177 (1993).

The presumption serves at least two purposes. It protects against "unintended clashes between our laws and those of other nations which could result in international discord," and it reflects the notion that when Congress legislates, it "'is primarily concerned with domestic conditions.'" Aramco, 499 U.S. at 248, (quoting Foley Bros., 336 U.S. at 285). The Supreme Court has invoked the presumption in several cases involving the scope of broad regulatory statutes. See, e.g., Sale, 509 U.S. at 173 (holding that section 243(h) of Immigration and Nationality Act of 1952 did not protect aliens seized by authorities on high seas, despite broad language in statute referring to "any alien"); Aramco, 499 U.S. at 249 (holding that the version of Title VII of Civil Rights Act of 1964 then in force did not regulate employment practices of U.S. firms employing U.S. citizens abroad, even though

-15-

the statute contained broad provisions extending its prohibitions to, for example, "any activity, business, or industry in commerce"); Foley Bros., 336 U.S. at 285 (holding that federal labor statute requiring an eight-hour day provision in "[e]very contract made to which the United States . . . is a party" did not apply to contracts for work performed in foreign countries).

To be sure, in appropriate circumstances Congress's extraterritorial intent has on occasion been implied without explicit statement in the text or even history. Courts, as noted, will examine a statute's context and structure as well as its purpose and "all available evidence" in order to determine Congress's actual intent. Cf. Sale, 509 U.S. at 177. Carnero would, as noted, have us find implicit evidence of Congress's intent to apply the Act extraterritorially in the Act's purpose to protect U.S. investors and markets against frauds. Frauds against foreign subsidiaries uncovered by foreign whistleblowers may, undoubtedly, threaten U.S. investors in the parent just as do domestic frauds.

Carnero refers us to cases such as United States v. Bowman, 260 U.S. 94, 98 (1922) (presumption against extraterritoriality held not to limit a federal criminal statute, the terms of which were violated by U.S. citizens when they conspired abroad to defraud a domestic company partly owned by the United States government). Similarly, Carnero notes that the

Supreme Court has held the Sherman Act to apply to anti-competitive conduct abroad "that was meant to produce and did in fact produce some substantial effect in the United States." Hartford Fire Ins. Co. v. California, 509 U.S. 764, 796 (1993). See also, e.g., Schoenbaum v. Firstbrook, 405 F.2d 200, 206 (2d Cir. 1968) (civil antifraud provisions of the Exchange Act given extraterritorial application to protect American investors who purchase foreign securities on American exchanges and to protect the domestic securities market from the effects of improper foreign transactions in American securities).

But while the Sarbanes-Oxley purpose to protect investors and build confidence in U.S. securities markets may be a factor supporting extraterritorial application of the instant whistleblower protection provision, the other pertinent factors run strongly counter to finding an extraterritorial legislative intent. These contrary indicia prevent our determining that Congress has evidenced its "clear intent" for extraterritorial application. Not only is the text of 18 U.S.C. § 1514A silent as to any intent to apply it abroad, the statute's legislative history indicates that Congress gave no consideration to either the possibility or the problems of overseas application. In sharp contrast with this silence, Congress has provided expressly elsewhere in the Sarbanes-Oxley Act for extraterritorial enforcement of a different, criminal, whistleblower statute. By so providing, Congress

-17-

demonstrated that it was well able to call for extraterritorial application when it so desired. Also in the Act, Congress has provided expressly for the exterritorial application of certain other unrelated statutes, tailoring these so as to cope with problems of sovereignty and the like -- again demonstrating Congress's ability to provide for foreign application when it wished. Here, however, while placing the whistleblower provision's enforcement in the hands of the DOL, a domestic agency, Congress has made no provision for possible problems arising when that agency seeks to regulate employment relationships in foreign nations, nor has Congress provided the DOL with special powers and resources to conduct investigations abroad. Furthermore, judicial venue provisions written into the whistleblower protection statute were made expressly applicable only to whistleblower violations within the United States and to complainants residing here on the date of violation, with no corresponding basis being provided for venue as to foreign complainants claiming violations in foreign countries.

These factors, and more, not only fail to imply a clear congressional intent for extraterritorial application, but indicate that Congress never expected such application. We discuss them below.

1.  <u>Provisions and Structure of the Sarbanes-Oxley Act</u>

The whistleblower protection statute in 18 U.S.C. § 1514A is one part of the Corporate and Criminal Fraud Accountability Act of 2002.  It is incorporated as Title VIII, Section 806, within the Sarbanes-Oxley Act of 2002, Pub. L. No. 107-204, 116 Stat. 745 (July 30, 2002).  The Sarbanes-Oxley Act itself is a major piece of legislation bundling together a large number of diverse and independent statutes, all designed to improve the quality of and transparency in financial reporting and auditing of public companies.  The Act increases criminal penalties for securities fraud and other violations and provides for the promulgation of codes of ethics and various other means for holding public companies to higher reporting standards.

A major part of the Act is devoted to creating a new body, the Public Company Accounting Oversight Board, which, serving under the Securities and Exchange Commission, will supervise and regulate the activities of public accounting firms.  The latter, in turn, are made responsible for auditing public companies.  Unlike the present whistleblower protection provision contained in Section 806, which makes no reference to foreign entities, Section 106 of the Act deals expressly with foreign accounting firms, requiring them to register with the Board if they audit public companies but carving out exceptions tailored to difficulties inherent in U.S. regulation of overseas professionals.  <u>See</u> 15 U.S.C. § 7216(c)

(2005) (providing that the SEC or the Board may, as it "determines necessary or appropriate in the public interest or for the protection of investors," exempt a foreign public accounting firm from the Act).  The accounting provision reflects Congress's recognition that the application of domestic U.S. regulatory statutes to persons abroad presents problems in addition to those of purely domestic application, and of the need to address those problems specifically.

Besides the whistleblower statute here at issue, found in Section 806 of the Act, two other separate provisions in Sarbanes-Oxley deal with whistleblower protection.  Section 301 of the Act requires the audit committees of issuers (which include foreign issuers)[6] to implement internal procedures that facilitate and encourage "anonymous" whistleblowing by employees concerning "questionable accounting or auditing matters."  See 15 U.S.C. § 78j-1(m)(4) (2005).[7]  Section 301 does not, however, purport to

_____

[6]"Issuer" is defined in Section 2(a)(7) of the Act as "an issuer (as defined in section 3 of the Securities Exchange Act of 1934 (15 U.S.C. 78c)), the securities of which are registered under section 12 of that Act (15 U.S.C. 78l), or that is required to file reports under section 15(d) (15 U.S.C. 78o(d)), or that files or has filed a registration statement that has not yet become effective under the Securities Act of 1933 (15 U.S.C. 77a et seq.), and that it has not withdrawn."  The definition of "issuer" is thus slightly broader than the definition of companies subject to the whistleblower protection provision, since it includes any company that has not yet become listed on a U.S. securities exchange.

[7]15 U.S.C. § 78j-1(m)(4) provides:

Complaints.--Each audit committee shall establish

confer enforceable rights upon employees, hence does not implicate the foreign sovereignty and other concerns, infra, raised by a provision like Section 806 providing for an adjudicatory process and remedies.[8]

The other whistleblower provision found in the Sarbanes-Oxley Act, Section 1107, is significant here by way of contrast to the instant Section 806. Section 1107 amended 18 U.S.C. § 1513

---

procedures for--(A) the receipt, retention, and treatment of complaints received by the issuer regarding accounting, internal accounting controls, or auditing matters; and (B) the confidential, anonymous submission by employees of the issuer of concerns regarding questionable accounting or auditing matters.

[8]Section 307 of the Sarbanes-Oxley Act directs the SEC to "issue rules, in the public interest and for the protection of investors, setting forth minimum standards of professional conduct for attorneys appearing and practicing before the Commission in any way in the representation of issuers," including a rule requiring the internal reporting "of a material violation of securities law or breach of fiduciary duty or similar violation by the company or any agent thereof." See 15 U.S.C. § 7245 (2005). The SEC has applied this internal reporting provision to domestic and foreign attorneys. See 17 C.F.R. § 205.2(a)(2)(ii), (c), and (j) (2005) (defining "attorney" to include "any person who is admitted, licensed, or otherwise qualified to practice law in any jurisdiction, domestic or foreign," but excepting a "non-appearing foreign attorney"); see generally Implementation of Standards of Professional Conduct for Attorneys, 68 Fed. Reg. 6296-01, 2003 WL 247093 (Feb. 6, 2003) (SEC Final Rule implementing Section 307). As with Section 301, we find this provision of limited value in discerning the geographic reach of the employee protections in Section 806. It does not implicate the foreign sovereignty and other concerns that are raised by a provision providing for an adjudicatory process and remedies.

(2000 & Supp. 2005) by adding subsection (e)[9] providing criminal sanctions for retaliation against anyone giving truthful information to law enforcement officers relating to the commission of any federal offense.[10] There is express provision for extraterritorial jurisdiction of § 1513 including subsection (e). See 18 U.S.C. § 1513(d) ("There is extraterritorial Federal jurisdiction over an offense under this section."). That Congress provided for extraterritorial reach as to Section 1107 but did not do so as to Section 806 (the provision relevant here) conveys the implication that Congress did not mean Section 806 to have extraterritorial effect. See Russello v. United States, 464 U.S. 16, 23 (1983) ("'[W]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion.'") (citation omitted); see also Aramco, 499 U.S. at 258 ("Congress' awareness of the need to make a clear statement that a statute applies

---

[9]It appears that through a drafting error, Congress enacted two subsections (e). The other subsection covers conspiracy.

[10]18 U.S.C. § 1513(e) provides:

> Whoever knowingly, with the intent to retaliate, takes any action harmful to any person, including interference with the lawful employment or livelihood of any person, for providing to a law enforcement officer any truthful information relating to the commission or possible commission of any Federal offense, shall be fined under this title or imprisoned not more than 10 years, or both.

-22-

overseas is amply demonstrated by the numerous occasions on which it has expressly legislated the extraterritorial application of a statute.").

### 2. Legislative History

The legislative history of the instant Section 806, 18 U.S.C. § 1514A, gives no indication that Congress meant to apply its civil whistleblower protections extraterritorially. The relevant congressional debate focused upon concern over the lack of whistleblower protection for private corporate employees in many states of the union. The original version of the statute was introduced by Senator Leahy and three cosponsors (Senators Daschle, Durbin and Harkin) on March 12, 2002, see 148 Cong. Rec. S1783-01, 2002 WL 384616, and reported by the Committee on the Judiciary on May 6, 2002, see S. Rep. 107-146, 2002 WL 863249. Senator Leahy explained that the purpose of the statute was to provide federal protection to private corporate whistleblowers, as was already done with government employees, in light of the "patchwork and vagaries of current state [whistleblower protection] laws." See S. Rep. 107-146, at 10 (emphasis added). Senator Leahy addressed the need to provide federal protection where state laws failed to protect certain private corporate whistleblowers, like Sherron Watkins, an employee at Enron Corporation in Texas. It is pertinent to quote Senator Leahy's statements at length:

> In a variety of instances when corporate employees at both Enron and [Arthur] Andersen

-23-

attempted to report or "blow the whistle" on fraud, [] they were discouraged at nearly every turn. For instance, a shocking e-mail from Enron's outside lawyers to an Enron official was uncovered.  This e-mail responds to a request for legal advice after a senior Enron employee, Sherron Watkins, tried to report accounting irregularities at the highest levels of the company in late August 2001.  The outside lawyer[] counseled Enron, in pertinent part, as follows:  You asked that I include in this communication a summary of the possible risks associated with discharging (or constructively discharging) employees who report allegations of improper accounting practices:  1.  Texas law does not currently protect corporate whistleblowers.  The [Texas] supreme court has twice declined to create a cause of action for whistleblowers who are discharged * * *

. . . .

According to media accounts, this was not an isolated example of whistleblowing associated with the Enron case.  . . . .  These examples further expose a culture, supported by law, that discourage employees from reporting fraudulent behavior not only to the proper authorities, such as the FBI and the SEC, but even internally.  This "corporate code of silence" not only hampers investigations, but also creates a climate where ongoing wrongdoing can occur with virtual impunity. The consequences of this corporate code of silence for investors in publicly traded companies, in particular, and for the stock market, in general, are serious and adverse, and they must be remedied.

. . . .

Corporate employees who report fraud are subject to the patchwork and vagaries of current state laws, although most publicly traded companies do business nationwide. Thus, a whistleblowing employee in one state may be far more vulnerable to retaliation than

-24-

a fellow employee in another state who takes the same actions. Unfortunately, as demonstrated in the tobacco industry litigation and the Enron case, efforts to quiet whistleblowers and retaliate against them for being "disloyal" or "litigation risks" transcend state lines. This corporate culture must change, and the law can lead the way. That is why S. 2010 is supported by public interest advocates, such as the National Whistleblower Center, the Government Accountability Project, and Taxpayers Against Fraud, who have called this bill "the single most effective measure possible to prevent recurrences of the Enron debacle and similar threats to the nation's financial markets."

. . . .

The bill does not supplant or replace state law, but sets a national floor for employee protections in the context of publicly traded companies.

Id. at 4-5, 10, 20.[11]

Other parts of the legislative history confirm the legislators' focus on problems within the United States. See 148 Cong. Rec. S6436-02, S6437, 2002 WL 1466715 (July 9, 2002) (statement of Sen. Daschle) ("People like Sherron Watkins of Enron will be protected from reprisal for the first time under federal law. This bill is going to help prosecutors gain important insider

---

[11]Some amendments to the original bill (offered by Senator Grassley and cosponsored by Senator Leahy) made its protections more consistent with those provided to other non-government employees, like those in the aviation industry. The original bill was revised to exclude punitive damages and to remove a provision that allowed immediate access to federal district courts. However, a compromise provided corporate whistleblowers with access to federal court in the event the Secretary of Labor fails to issue a final decision within six months. Id. at 22, 26.

-25-

testimony on fraud and put a permanent dent in the 'corporate code of silence.'"); id. S6439 (statement of Sen. Leahy) (emphasizing that the Enron case "demonstrates the vulnerability of corporate whistleblowers to retaliation under current law" by pointing to outside counsel's memorandum that "Texas law does not currently protect corporate whistleblowers"); 148 Cong. Rec. S6734-02, S6761, 2002 WL 1532280 (July 15, 2002) (statement of Sen. Snowe) ("[T]he Leahy amendment grants important whistleblower protections to company employees-like Enron's Sherron Watkins-who bravely report wrongdoing occurring within their own corporation."); 148 Cong. Rec. S7350-04, S7358, 2002 WL 1724193 (July 25, 2002) (statement of Sen. Leahy) ("[W]e include meaningful protections for corporate whistleblowers, as passed by the Senate. We learned from Sherron Watkins of Enron that these corporate insiders are the key witnesses that need to be encouraged to report fraud and help prove it in court. Enron wanted to silence her as a whistleblower because Texas law would allow them to do it."); 148 Cong. Rec. H5462-02, H5473, 2002 WL 1724141 (July 25, 2002) (statement of Rep. Jackson-Lee) ("S.2673 extends whistleblower protections to corporate employees. . . . Whistleblowers in the private sector, like Sh[e]rron Watkins, should be afforded the same protections as government whistleblowers."); 148 Cong. Rec. S7418-01, S7420, 2002 WL 1731002 (July 26, 2002) (statement of Sen. Leahy) (repeating, almost verbatim, his May 2002 statements in relaying the

-26-

legislative history of Section 806; emphasizing that private corporate whistleblowers need federal protection because of "the patchwork and vagaries of current state laws").

Carnero argues that the statute was meant to have extraterritorial reach by pointing to a later statement by Senator Leahy that the statute was "intentionally written to sweep broadly, protecting any employee of a publicly traded company who took such reasonable action to try to protect investors and the market." See 149 Cong. Rec. S1725-01, S1725, 2003 WL 193278 (Jan. 29, 2003). Senator Leahy's overall statements that day were directed to the White House's incorrect interpretation that a whistleblower's disclosure to Congress would only be protected if made to a member conducting an investigation. The specific statement cited by Carnero, however, was once again focusing on the need for federal protection where state law failed to protect corporate whistleblowers. Here is the statement in context:

> The law was designed to protect people like Sherron Watkins from Enron . . . from retaliation when they report fraud to Federal investigators, regulators, or to any Member of Congress. **The law was intentionally written to sweep broadly, protecting any employee of a publicly traded company who took such reasonable action to try to protect investors and the market.**
>
> The reason that Senator Grassley and I know so much about the legislative intent behind this provision is that we crafted it together last year in the Judiciary Committee and worked to make it part of the Sarbanes-Oxley Act on the Senate floor. We had both seen enough cases

-27-

where corporate employees who possessed the courage to stand up and "do the right thing" found out the hard way that there is a severe penalty for breaking the "corporate code of silence." Indeed, in the Enron case itself we discovered an e-mail from outside counsel that noted that the Texas Supreme Court had twice refused to find a legal protection for corporate whistleblowers and that implicitly gave Enron the go ahead to fire Ms. Watkins for reporting accounting irregularities.

Id. (emphasis added).

The legislative history thus suggests that Congress was concerned about providing whistleblower protections for corporate employees in the various states. Nowhere in the legislative history is there any indication that 18 U.S.C. § 1514A was drafted with the purpose of extending to foreign employees working in nations outside of the United States the right to seek administrative and judicial civil relief under the Act. While the legislative history contains repeated references to the "states," particularly Texas, there are no parallel references to foreign countries.[12] See Foley Bros., 336 U.S. at 286-87 (holding that federal Eight Hour Law did not apply overseas where legislative history revealed that Congress was primarily concerned with domestic employment conditions).

---

[12]The legislative history also indicates that the whistleblower protections for corporate employees were meant to closely track the protections offered to airline employees under the Wendell H. Ford Aviation Investment and Reform Act for the 21st Century ("AIR21"), 49 U.S.C. § 42121 (2005). See S. Rep. 107-146, at 26. We have found no indication that AIR21's whistleblower protections apply extraterritorially.

By contrast, the legislative history of certain other provisions of the Sarbanes-Oxley Act shows that Congress expressly considered the application of those provisions to foreign entities. For instance, Section 106, whose text as already mentioned applies to foreign public accounting firms, also has history revealing Congress's thoughts in applying that statute abroad. See S. Rep. 107-205, at 11, 2002 WL 1443523 (July 3, 2002). Senator Sarbanes stated:

> Companies that sell shares to U.S. investors, and are subject to the federal securities laws, can be organized and operate in any part of the world. Their financial statements are not necessarily audited by U.S. accounting firms, and the Committee believes that there should be no difference in treatment of a public company's auditors under the bill simply because of a particular auditor's place of operation. Otherwise, a significant loophole in the protection offered U.S. investors would be built into the statutory system.

> Thus, accounting firms organized under the laws of countries other than the United States that issue audit reports for public companies subject to the U.S. securities laws are covered by the bill in the same manner as domestic accounting firms, subject to the exemptive authority of both the [Public Company Accounting Oversight] Board and the SEC.

Section 302 of the Act provides that a company's principal executive officers and principal financial officers, or persons performing similar functions, must certify the material

-29-

completeness and accuracy of SEC filings. <u>See</u> 15 U.S.C. § 7241 (2005). While the statute itself does not indicate whether officers of both U.S. and foreign companies are covered, its legislative history is suggestive on the subject. <u>See</u> 148 Cong. Rec. S6687-01, S6698, 2002 WL 1486863 (July 12, 2002). Senator Graham stated:

> If companies are being publically traded in the United States, regardless of where their headquarters are located, they ought to be required to meet the same level of accountability that we are establishing for everyone else in this legislation.

Other parts of the legislative history reveal Congress's sensitivity to the application of some of the Act's provisions to foreign entities. Some members of Congress, for instance, were reluctant to impose U.S. corporate reforms on countries with adequate or superior corporate governance regimes. <u>See</u> 148 Cong. Rec. S7350-04, S7356, 2002 WL 1724193 (July 25, 2002). Senator Enzi commented:

> I believe we need to be clear with respect to the area of foreign issuers and their coverage under the bill's broad definitions. While foreign issuers can be listed and traded in the U.S. if they agree to conform to GAAP and New York Stock Exchange rules, the SEC historically has permitted the home country of the issuer to implement corporate governance standards. Foreign issuers are not part of the current problems being seen in the U.S. capital markets, and I do not believe it was the intent of the conferees to export U.S. standards disregarding the sovereignty of other countries as well as their

> regulators. . . . Under the conference report, section 3(a) [which was enacted] gives the SEC wide authority to enact implementing regulations that are "necessary or appropriate in the public interest." I believe it is the intent of the conferees to permit the Commission wide latitude in using their rulemaking authority to deal with technical matters such as the scope of the definitions and their applicability to foreign issuers.

The foregoing show Congress's keen awareness of the application of some of the Sarbanes-Oxley Act provisions to entities in other countries and of the associated problems. Accordingly, Congress's complete silence as to overseas application of the instant whistleblower protection provision (combined with Congress's repeated reference to the need for that provision to supplement state enforcement), provides significant indication that Congress did not intend 18 U.S.C. § 1514A to apply extraterritorially.

3. <u>Other Factors</u>

Other factors lend support to the conclusion that the whistleblower protection provision in 18 U.S.C. § 1514A was not meant to apply extraterritorially.

a. <u>Problems of Extraterritorial Enforcement</u>

If the whistleblower protection provision is given extraterritorial reach in a case like the present one, it would empower U.S. courts and a U.S. agency, the DOL, to delve into the employment relationship between foreign employers and their foreign

-31-

employees.  Carnero, whose direct employers were two Latin American corporations, has asked the United States district court for, among other relief, his reinstatement.  The door would thus be opened for U.S. courts to examine and adjudicate relationships abroad that would normally be handled by a foreign country's own courts and government agencies pursuant to its own laws.  In enacting other laws that affect employment relationships extraterritorially, members of Congress have recognized "the well-established principle of sovereignty . . . that no nation has the right to impose its labor standards on another country."  See S. Rep. 98-467, at 27-28 (1984), reprinted in 1984 U.S.C.C.A.N. 2974, 3000-01 (limiting age discrimination law's extraterritorial reach to U.S. citizens employed by U.S. corporations or their subsidiaries in countries that do not have inconsistent laws); see also Foley Bros., 336 U.S. at 578 (noting that "labor conditions [of its own citizens] are the primary concern of a foreign country").  We believe if Congress had intended that the whistleblower provision would apply abroad to foreign entities, it would have said so, and certainly would have considered, before enacting the law, the problems and limits of extraterritorial enforcement.  Yet Congress did not at any time discuss the interest other countries would have in regulating these employment relationships, nor did Congress include in the whistleblower provision any mechanism for resolving potential conflicts with foreign labor laws and procedures.  Congress's

-32-

complete silence suggests that it had no thought or intention to apply this provision to foreign employees and entities as now proposed.

Further suggestive of Congress's lack of extraterritorial intent is its failure to provide any mechanism for enforcing the whistleblower protections in a foreign setting. Congress did not grant, or even discuss the granting of, extraterritorial investigatory powers to the Department of Labor, the agency charged with administering whistleblower complaints.[13] See Aramco, 499 U.S. at 256 (concluding that Congress's restrictive intent as to geographic reach of Title VII was evidenced by lack of extraterritorial venue and other enforcement mechanisms in statute). No reference is made to providing for interpreters, for coordinating with the Department of State, or for the utilization of foreign personnel. Significantly, the DOL is given only sixty days to complete its entire investigation of a complaint and to issue findings under the procedure mandated by 49 U.S.C. § 42121(b)(2)(A).[14] See 18 U.S.C. § 1514A(b)(2). This short time

---

[13]The DOL has been charged with administering whistleblower complaints in a variety of employment contexts, even where another agency, having the technical expertise in the subject area of the complaints (such as the SEC here), has overall control. See, e.g., Kansas Gas & Elec. Co. v. Brock, 780 F.2d 1505, 1509 (10th Cir. 1985) (noting that DOL administers nuclear energy employee whistleblower complaints, even though the Nuclear Regulatory Commission has expertise on nuclear issues).

[14]49 U.S.C. § 42121(b)(2)(A) provides, in relevant part:

-33-

frame seems unrealistic if the DOL were expected to conduct investigations overseas.[15] Moreover, if an administrative hearing is held, the hearing "shall be conducted expeditiously" under 49 U.S.C. § 42121(b)(2)(A). See id. There is no provision either for the resources or the flexibility that might be needed in dealing with foreign matters; and, as said, the legislative history contains no discussion of this or other problems likely to arise had Congress meant this provision to apply outside the territorial United States. The statute, it must be remembered, protects a whistleblowing employee from retaliation or other discrimination by a publicly traded company, or "any officer, employee, contractor,

_____

> Not later than 60 days after the date of receipt of a complaint filed under paragraph (1) and after affording the person named in the complaint an opportunity to submit to the Secretary of Labor a written response to the complaint and an opportunity to meet with a representative of the Secretary to present statements from witnesses, the Secretary of Labor shall conduct an investigation and determine whether there is reasonable cause to believe that the complaint has merit and notify, in writing, the complainant and the person alleged to have committed a violation of subsection (a) of the Secretary's findings.

[15]While other whistleblower protection statutes provide for a sixty-day investigation time frame, see Procedures for the Handling of Discrimination Complaints Under Section 806 of the Corporate and Criminal Fraud Accountability Act of 2002, Title VIII of the Sarbanes-Oxley Act of 2002, 69 Fed. Reg. 52104-01, 52108, 2004 WL 1876043 (Aug. 24, 2004) ("Sarbanes-Oxley Regulations") (citing AIR21 and the Surface Transportation Assistance Act), to our knowledge, none of these statutes have been applied extraterritorially to employees resident and working outside of the United States.

subcontractor, or agent of such company." <u>Id.</u> § 1514A(a). If the statute has extraterritorial effect, this broad coverage would create an expansive class of potential whistleblowers by extending its protections to countless employees in countless areas around the world. And yet, there is no discussion about the increased administrative and logistical burdens that would fall on the DOL to administer such a far-reaching statute. These omissions are striking. They indicate that Congress did not focus on the possibility of extraterritorial application, with its attendant problems.

      b. <u>The Venue Provisions Contemplate Domestic Claims Only</u>

The whistleblower provision in question includes venue provisions instructing as to the particular federal court within which judicial claims are to be brought. There is no venue provision specifically tailored to claims based on conduct abroad, and, significantly, two of the venue provisions for various stages of court review would exclude foreign claims of the instant sort.

For whistleblower complaints brought under 18 U.S.C. § 1514A, the Act incorporates by reference the procedural structure for whistleblower complaints filed with the United States Department of Labor under the Wendell H. Ford Aviation Investment and Reform Act for the 21st Century ("AIR21"), 49 U.S.C. § 42121 (2005). <u>Id.</u> § 1514A(b)(2)(A) ("An action under paragraph (1)(A) shall be governed under the rules and procedures set forth in

-35-

section 42121(b) of title 49 United States Code.").[16]  AIR21 contains nothing prescribing a federal venue for whistleblower complaints or appeals based on conduct abroad, brought by employees resident and working in a foreign country.  While de novo review, such as in this case, may be sought "in the appropriate district court of the United States," the "appropriate court" is not defined, 18 U.S.C. § 1514A(b)(1)(B).  49 U.S.C. § 42121(b)(6) and related provisions suggest that the appropriate court is one in the jurisdiction of which the whistleblower violation occurred or the complainant resided.  Hence 49 U.S.C. § 42121(b)(4)(A) provides that appeal from the Secretary's final order should be directed to the federal court of appeals "for the circuit in which the violation, with respect to which the order was issued, allegedly

_____

[16]The "Whistleblower Protection Program" under AIR21 provides for:  (1) the filing of a complaint with the Secretary of Labor alleging retaliatory discharge or discrimination; (2) an opportunity for the person named in the complaint to submit a written response and meet with a representative of the Secretary to present witness statements; (3) an investigation by the Secretary into the merits of the complaint; (4) a preliminary order by the Secretary providing relief, including reinstatement, if there is reasonable cause to believe a violation occurred, (5) the opportunity to file objections and request a hearing; (6) a final order by the Secretary providing relief or denying the complaint; (7) appellate court review of the Secretary's final order; and (8) enforcement of the final order in the federal district court by the Secretary or parties.  See 49 U.S.C. § 42121(b).

The DOL regulations implementing AIR21 and Sarbanes-Oxley whistleblower protection provisions provide for the receipt and investigation of complaints by OSHA, hearings by the Office of Administrative Law Judges, and appeals of ALJ decisions by the Administrative Review Board (all acting on behalf of the Secretary of Labor).  See 29 C.F.R. pt. 1980 (2005) (Sarbanes-Oxley Regulations); 29 C.F.R. pt. 1979 (2005) (AIR21 Regulations).

-36-

occurred or the circuit in which the complainant resided on the date of such violation."  Section 42121(b)(5) provides that the Secretary may enforce a final order by filing a civil action "in the United States district court for the district in which the violation was found to occur."  Even if the "appropriate court" language is broadly construed to allow venue at a stage like the present, the above restrictive venue provisions would deny venue at other key stages of proceedings instituted by a foreign employee. For Congress to have deliberately created such a discrepancy would seem highly improbable.  It is more likely Congress simply did not contemplate the filing of administrative complaints by foreign employees working abroad, and hence enacted no comprehensive set of venue provisions suited to that eventuality.

### c.  The Department of Labor's Preliminary Rulings

The DOL has not issued any policy statement on the geographic reach of the whistleblower protection statute.  Indeed, the DOL has declined to make a statement of policy.  When asked by commentators prior to the promulgation of its final regulations to exclude from the statute's coverage employees working outside of the United States, the DOL replied:  "The purpose of this rule is to provide procedures for the handling of Sarbanes-Oxley discrimination complaints; this rule is not intended to provide statutory interpretations."  See Sarbanes-Oxley Regulations, 69 Fed. Reg. 52104-01, 52105, 2004 WL 1876043 (Aug. 24, 2004).

-37-

OSHA's Regional Administrator and the DOL's Administrative Law Judges, however, have held on at least three occasions (in this case and two others) while adjudicating whistleblower complaints under 18 U.S.C. § 1514A that the statute does not apply extraterritorially to employees working outside of the United States, based on their examination of the statute and their interpretation of the case law. See Carnero v. Boston Scientific Corp., 2004-SOX-22 (OSHA Reg'l Adm'r) (Dec. 19, 2003); Concone v. Capital One Fin. Corp., 2005-SOX-6 (ALJ) (Dec. 3, 2004); Ede v. Swatch Group, 2004-SOX-68, 2004-SOX-69 (ALJ) (Jan. 14, 2005). These determinations suggest at least the misgivings of the designated enforcement agency about interpreting 18 U.S.C. § 1514A as embracing extraterritorial enforcement.

### 4. No Clear Expression of Congressional Intent

Whether to confer extraterritorial effect is a policy choice for Congress. Our role is limited to ascertaining Congress's intent. "In essence, [the foreign claimant such as Carnero] asks this court to conclude that Congress balanced [the provision's] important goals against the foreign sovereignty concerns that underlie the presumption against extraterritoriality, considered the implications of application abroad and then addressed these concerns by inviting courts to read between the lines." Boureslan v. Aramco, Arabian Am. Oil Co., 892 F.2d 1271, 1274 (5th Cir. 1990) (en banc), aff'd sub nom. E.E.O.C. v. Arabian

Am. Oil Co., 499 U.S. 244 (1991).  For the reasons stated above, we see no indication that Congress entered into any such balancing.  To the contrary, it made no reference to application abroad and tailored the relevant statute to purely domestic application.  We hold that 18 U.S.C. § 1514A does not reflect the necessary clear expression of congressional intent to extend its reach beyond our nation's borders.[17]  We hold, therefore, that the district court properly dismissed Carnero's complaint under 18 U.S.C. § 1514A.

### III.  The State Law Claims

We turn next to the dismissal of Carnero's claims under Massachusetts law for, among other things, breach of contract and retaliatory termination.  The district court based the dismissal on two factual findings:  (1) Carnero "had no contact with the defendant in Massachusetts," and (2) "defendant [did not] in any way direct or control plaintiff [in his employment]."  Carnero, No. 03-11479-RWZ (D. Mass.) (Mar. 25, 2004 endorsed order).

Carnero argues that these findings are not supported by the record.  We need not decide the correctness of these findings, however, because we agree with BSC that we may affirm the district

_____

[17]We decide this case necessarily on its own facts.  One can imagine many other fact patterns that may or may not be covered by our reasoning in today's decision.  We do not, for example, decide today whether Congress intended to cover an employee based in the United States who is retaliated against for whistleblowing while on a temporary assignment overseas.  That issue is not before us as Carnero was a resident of Argentina and Brazil directly employed by foreign companies operating in those countries.

court's judgment based on an alternative ground presented below in BSC's motion to dismiss the complaint: that BSA is an indispensable party under Fed. R. Civ. P. 19 and could not be joined without destroying the court's diversity jurisdiction.  See Gabriel v. Preble, 396 F.3d 10, 12 (1st Cir. 2005) (noting that appellate court may affirm order of dismissal on any ground fairly presented by the record); see also Am. Fiber & Finishing, Inc. v. Tyco Healthcare Group, LP, 362 F.3d 136, 138-39 (1st Cir. 2004) (noting that challenge to federal subject matter jurisdiction may be considered for the first time on appeal).

Even assuming that BSC played a significant role in Carnero's employment, it is clear from Carnero's complaint that Carnero worked for BSA, was paid by BSA, complained about alleged billing irregularities at BSA, was terminated from BSA, and seeks to be reinstated at BSA.  BSA is obviously needed for a full and just adjudication of this dispute, and could not be joined without destroying the court's diversity jurisdiction because BSA and Carnero are both Argentinian citizens.  See, e.g., H.D. Corp. of P.R. v. Ford Motor Co., 791 F.2d 987, 993 (1st Cir. 1986) (reciting Fed. R. Civ. P. 19(b) factors and affirming dismissal of action where non-diverse parent company was indispensable party in part because it was signatory to agreements at issue).[18]

---

[18]Carnero does not present any argument on appeal as to why BSA should not be treated as an indispensable party.  He merely argues that we should reverse and remand the state law action to the

For the foregoing reasons, the judgments of the district court are affirmed.

So Ordered.

---

district court for further factual findings. No additional findings are required, though, given the nature of Carnero's relationship with BSA as alleged in his complaint. And, although Carnero includes a brief reference in his reply brief to an argument he raised below regarding BSA's necessity as a party, we find that argument waived, see Hoult v. Hoult, 373 F.3d 47, 53 (1st Cir. 2004) (noting that appellant cannot raise argument for first time in reply brief); United States v. Bongiorno, 106 F.3d 1027, 1034 (1st Cir. 1997) (noting that court will not consider argument raised in perfunctory manner), and without merit in any event.