# United States Court of Appeals
## For the First Circuit

No. 08-1306

CHARLES FITZGERALD; KENNETH CLINE,

Plaintiffs, Appellants,

v.

WILLARD R. HARRIS, JR., in his capacity as
Director of the Maine Bureau of Parks and Lands,

Defendant, Appellee.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MAINE

[Hon. John A. Woodcock, Jr., U.S. District Judge]

Before

Lynch, Chief Judge,
Selya and Boudin, Circuit Judges.

David A. Nicholas with whom Bruce M. Merrill was on brief
for appellants.
Paul Stern, Deputy Attorney General, with whom G. Steven
Rowe, Attorney General, and Gerald D. Reid, Assistant Attorney
General, were on brief for appellee.

December 5, 2008

**LYNCH**, **Chief Judge**.  This case raises the issue of whether a Maine statute governing the management of a state-administered river, the Allagash Wilderness Waterway ("AWW"), Me. Rev. Stat. Ann. tit. 12, § 1882, is preempted by certain sections of a federal statute, the Wild and Scenic Rivers Act ("WSRA"), 16 U.S.C. § 1271 et seq.

Plaintiffs Charles FitzGerald and Kenneth Cline (collectively "FitzGerald") are avid canoeists who sued Willard R. Harris, Director of the Maine Bureau of Parks and Lands, seeking a declaration that the Maine statute is preempted by federal law, as well as injunctive relief against the enforcement of the Maine statute.  Their essential complaint is that the provisions of Maine's statute maintaining certain bridges and public access points to the AWW destroy the "wild" character of the river.  There have been, to our knowledge, no prior federal courts of appeals decisions squarely involving claims of preemption of state statutes by the WSRA, which was enacted in 1968.

The district court granted Harris's motion to dismiss under Fed. R. Civ. P. 12(b)(6), adopting the magistrate judge's recommended decision holding that the Maine statute is not preempted by federal law.  We affirm.

I.

A.          The Federal Statutory Structure

Congress enacted the WSRA to "preserve . . . selected rivers or sections thereof in their free-flowing condition[,] to protect the water quality of such rivers[,] and to fulfill other vital national conservation purposes." 16 U.S.C. § 1271. Congress described the eligibility criteria for inclusion in the system of protected rivers as follows:

> A wild, scenic or recreational river area eligible to be included in the system is a free-flowing stream and the related adjacent land area that possesses one or more of the values referred to in section 1271 of this title. Every wild, scenic or recreational river in its free-flowing condition, or upon restoration to this condition, shall be considered eligible for inclusion in the national wild and scenic rivers system and, if included, shall be classified, designated, and administered as one of the following:
>    (1) Wild river areas -- Those rivers or sections of rivers that are free of impoundments and generally inaccessible except by trail, with watersheds or shorelines essentially primitive and waters unpolluted. These represent vestiges of primitive America.
>    (2) Scenic river areas -- Those rivers or sections of rivers that are free of impoundments, with shorelines or watersheds still largely primitive and shorelines largely undeveloped, but accessible in places by roads.
>    (3) Recreational river areas -- Those rivers or sections of rivers that are readily accessible by road or railroad, that may have some development along their shorelines, and that may have undergone some impoundment or diversion in the past.

Id. § 1273(b).

Rivers may be designated for protection under the WSRA in one of two ways: (1) by act of Congress under section 2(a)(i); or (2) by application of a state to the Secretary of the Interior under section 2(a)(ii).  Id. § 1273(a).  Those rivers included under section 2(a)(ii) "are to be permanently administered as wild, scenic or recreational rivers by an agency or political subdivision of the State or States concerned."  Id.

Those two methods for inclusion create a system of both state- and federally-administered rivers.  State-administered rivers are those rivers designated after a state applies to the federal Secretary of the Interior under section 2(a)(ii).  Federally-administered rivers are those established by Congress under section 2(a)(i).  A list of federally-administered rivers is contained in 16 U.S.C. § 1274.  When Congress creates a federally-administered river, it designates the federal department charged with managing the river.  See, e.g., id. § 1274(a)(1) (designating the Middle Fork of the Clearwater River in Idaho as a federally-administered river to be managed by the Secretary of Agriculture); id. § 1274(a)(8) (designating a portion of the Wolf River in Wisconsin as a federally-administered river to be managed by the Secretary of the Interior).

A single river may have zones that are state-administered and others that are federally-administered. E.g., id. § 1274(a)(9) (designating a section of the Lower Saint Croix River as federally-

administered and providing that the governors of Wisconsin and Minnesota may apply to have another segment designated as state-administered).  The AWW is entirely a state-administered river.

The WSRA, like many cooperative federalism statutes, uses carrots and sticks to encourage states to comply with its objectives.  The carrots include three categories of benefits: protection, assistance, and funding.  The protections are primarily contained in 16 U.S.C. § 1278, entitled "Restrictions on water resources projects."  Those protections: (1) prohibit construction projects licensed by the Federal Energy Regulatory Commission on or directly affecting a designated river; (2) prevent all United States agencies or departments from assisting by any means in the construction of any water resources project or from recommending any water resources project that would have "a direct and adverse effect on the values for which such river was established"; and (3) require prior notice to certain secretaries of federal departments before requesting authorization or appropriations for water resources projects and give special notice to Congress of the conflict between the project and the values protected by the WSRA. See id. § 1278(a).

Executive agencies may also assist the states in managing their rivers as set forth in 16 U.S.C. § 1282, entitled "Assistance to State and local projects."  The Secretary of the Interior must encourage and assist the states "in formulating and carrying out

their comprehensive statewide outdoor recreation plans" to consider the "needs and opportunities for establishing State and local wild, scenic and recreational river areas." Id. § 1282(a). The Secretaries of the Interior and Agriculture and the heads of other federal agencies "shall assist, advise, and cooperate" with the states "to plan, protect, and manage river resources," which may be accomplished through "written agreements or otherwise." Id. § 1282(b)(1). Further assistance under the WSRA may be made available to volunteers and volunteer organizations in the form of federal "facilities, equipment, tools, and technical assistance." Id. § 1282(b)(3). The authority of federal agencies to negotiate agreements regarding the management of protected rivers is, however, notably restricted: the issuance of a permit or other authorization cannot be conditioned on such an agreement. Id. § 1282(b)(4).

As for financial assistance to participating states, the Secretary of the Interior must assist the states in proposals for financial assistance under the Water Conservation Fund Act of 1965. Id. § 1282(a). The Secretaries of the Interior and Agriculture or other federal agency heads may enter into agreements for "limited financial or other assistance to encourage participation in the acquisition, protection, and management of river resources." Id. § 1282(b)(1). Yet despite this financial assistance, Congress has been clear that the states must fund the administration of their

-6-

own designated rivers. Id. § 1273(a) ("Each river designated under clause (ii) shall be administered by the State or political subdivision thereof without expense to the United States other than for administration and management of federally owned lands.").

There are also sticks to encourage state compliance. Congress chose not to provide the stick of an explicit cause of action to enforce the goals of the WSRA against the states. But one available stick is the denial of the benefits described above. Another is that federal agencies, such as the Army Corps of Engineers, may refuse to grant needed permits for bridge construction where they consider a river not to be in compliance. There is a third stick -- the removal of a state-administered river from the system of protected rivers, either by Congress or the relevant federal agencies. The Departments of the Interior and Agriculture have recognized the power of the Secretary of the Interior to reclassify or withdraw a mismanaged section 2(a)(ii) river from the wild and scenic rivers system. See U.S. Dep'ts of the Interior & Agric., Guidelines for Evaluating Wild, Scenic and Recreational River Areas Proposed for Inclusion in the National Wild and Scenic Rivers System Under Section 2, Public Law 90-542 6 (1970) ("Future construction of such structures that would have a direct and adverse effect on the values for which that river area was included in the national system . . . would not be permitted. In the case of rivers added to the national system pursuant to Sec.

-7-

2(a)(ii), such construction could result in a determination by the Secretary of the Interior to reclassify or withdraw the affected river area from the system."). FitzGerald denies that there is any such power in the Secretary of the Interior, arguing that only Congress may downgrade or remove rivers. We need not resolve this dispute to decide this case.

B.        The AWW's Inclusion Under the WSRA

The AWW is approximately eighty-five miles long and connects a series of forty lakes and ponds, as well as numerous streams and brooks in northern Maine. It has provided a wilderness canoeing experience for centuries. Henry David Thoreau canoed the river during July 1857. He wrote of his experience:

> It is wonderful how well watered this country is. . . . Generally, you may go in any direction in a canoe, by making frequent but not very long portages. You are only realizing once more what all nature distinctly remembers here, for no doubt the waters flowed thus in a former geological period, and instead of being a lake country, it was an archipelago.

H.D. Thoreau, The Maine Woods 251-52 (1864).

Before Congress passed the WSRA, Maine took independent steps to protect the AWW through the Allagash Wilderness Waterway Act of 1966, now codified at Me. Rev. Stat. Ann. tit. 12, § 1871 et seq. The Act defines an eighty-five mile stretch of the Allagash River as the AWW, id. § 1872(12), and establishes a "restricted zone" extending between a minimum of 400 feet and maximum of 800

-8-

feet in width around the watercourse to "preserve, protect and develop the maximum wilderness character of the watercourse," id. § 1873(3). The Act leaves administration of the AWW largely to Maine's Bureau of Parks and Lands. Id. § 1874. The Bureau is empowered to enact rules and regulations governing the AWW to preserve "the natural beauty, historic integrity and character of the Allagash Wilderness Waterway." Id. § 1803. Before 2006, the state Act further provided that "[t]he bureau may determine the location of access points, control stations and watercourse crossings within the waterway." Id. § 1882 (2005). In this suit, FitzGerald challenges the amendments made to § 1882 in 2006.

The AWW was included for protection under section 2(a)(ii) of the WSRA in 1970. On April 10, 1970, then-Maine Governor Kenneth M. Curtis requested that then-Secretary of the Interior Walter J. Hickel designate a portion of the AWW as a state-administered "wild" river under section 2(a)(ii) of the WSRA. On May 4, 1970, Governor Curtis asked Secretary Hickel to include the entire AWW under the WSRA and submitted a report on the AWW in support of the state's application. On July 13, 1970, Secretary Hickel "determined that the entire Allagash Wilderness Waterway meets the requirements for classification as a wild river area under the provisions of the Wild and Scenic Rivers Act," 35 Fed. Reg. 11,525, 11,525 (July 17, 1970), and approved the AWW "as a

wild river area to be administered by the State of Maine," id. at 11,526.

In the Notice of Approval, Secretary Hickel recognized that there were three small dams on the AWW, six established areas for water aircraft traffic, various private logging roads, and trails for snowmobile use along the AWW. Id. With respect to public access to the AWW, Secretary Hickel noted:

> Public access over private roads will be permitted to and along a portion of Telos Lake at the southern end of the waterway and to the northern boundary at West Twin Brook. Existing private roads within the waterway which have been developed for logging purposes will be closed to public use. These private roads do not create a substantial impact on the overall wilderness character of the river.

Id. As to bridges over the AWW, Secretary Hickel stated that "[t]emporary bridges for short-term logging purposes may be authorized by the State. Any such crossing is designed to provide minimum impact on the wilderness character of the waterway." Id. Secretary Hickel also found that "[t]here is no substantial evidence of man's intrusion within the 400- to 800-foot restricted zone adjoining the watercourse." Id.

After the 1970 designation of the AWW as a state-administered wild river, the Maine Park and Recreation Commission, and later the Maine Bureau of Parks and Lands, continued to administer the AWW under the terms of the state Allagash Wilderness Waterway Act of 1966. On April 26, 2006, Maine amended part of the

Allagash Wilderness Waterway Act, the relevant section of which is now codified at Me. Rev. Stat. Ann. tit. 12, § 1882, to provide for the maintenance of six seasonal motor vehicle access points to the edge of the AWW, id. § 1882(1), five seasonal motor vehicle access points to short trails leading to the AWW, id. § 1882(2), and six permanent bridges over the AWW, id. § 1882(4). The motor vehicle access points and bridges described in the statute existed before the AWW's designation as a "wild" river under the WSRA, and thus the challenged state law maintains what was there before the designation and allows for the reconstruction of certain preexisting bridges.

On February 1, 2007, FitzGerald filed a federal suit against Harris, the state official charged with managing the AWW, alleging that Me. Rev. Stat. Ann. tit. 12, § 1882, as amended in 2006, is preempted by the WSRA. Specifically, FitzGerald contended that the Maine statute would "degrade the value which caused the AWW to be included in the National Wild and Scenic Rivers System" and "erode[] the AWW's wild condition," contrary to the mission of the WSRA. On March 19, 2007, Harris moved to dismiss the case, arguing that the suit was barred by the Eleventh Amendment, that the WSRA did not preempt the Maine statute, and that FitzGerald's requested injunctive relief was not a permissible remedy under the Supremacy Clause.

On August 20, 2007, a magistrate judge recommended that the case be dismissed under Fed. R. Civ. P. 12(b)(6) because the Maine statute was not preempted by the WSRA. On February 11, 2008, the district court affirmed the magistrate judge's recommended decision and granted Harris's motion to dismiss. FitzGerald timely appealed.

## II.

We review de novo the district court's dismissal under Fed. R. Civ. P. 12(b)(6). Thomas v. Rhode Island, 542 F.3d 944, 948 (1st Cir. 2008). We assume the truth of all well-pleaded facts in the complaint, drawing all reasonable inferences in the plaintiffs' favor. Id. To survive a motion to dismiss, the complaint must allege "a plausible entitlement to relief." Bell Atl. Corp. v. Twombly, 127 S. Ct. 1955, 1967 (2007); see also N.J. Carpenters Pension & Annuity Funds v. Biogen Idec Inc., 537 F.3d 35, 44 (1st Cir. 2008). The preemption issues raised are ones of law, not of fact, and are amenable to resolution by a motion to dismiss the complaint.[1] Plaintiffs have shown no plausible entitlement to relief.

---

[1] We bypass the questions regarding whether a cause of action for preemption is available to these plaintiffs and of the limits imposed on the remedial power of the federal courts by the Eleventh Amendment. Instead, we engage in a merits-based analysis, which avoids any potential constitutional issues. Parella v. Ret. Bd. of the R.I. Employees' Ret. Sys., 173 F.3d 46, 53-57 (1st Cir. 1999).

Under the Supremacy Clause, "the Laws of the United States . . . shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." U.S. Const. art. VI, cl. 2. State law may be preempted by federal law in three ways.[2] First, Congress can include "language in the federal statute that reveals an explicit congressional intent to pre-empt state law." Barnett Bank of Marion County, N.A. v. Nelson, 517 U.S. 25, 31 (1996). The Maine statute challenged here, Me. Rev. Stat. Ann. tit. 12, § 1882, is not preempted expressly by the WSRA. Nothing in the text of the federal statute expressly preempts state law regulation of rivers administered under section 2(a)(ii) of the WSRA, and FitzGerald agrees that there is no express preemption.

Second, Congress may implicitly preempt state law by "creat[ing] a scheme of federal regulation 'so pervasive as to make reasonable the inference that Congress left no room for the States to supplement it.'" Id. (quoting Rice v. Santa Fe Elevator Corp., 331 U.S. 218, 230 (1947)). This form of implied preemption is

_____

[2] The jurisdictional doctrine of "complete preemption" has no application here. "Complete preemption is a short-hand for the doctrine that in certain matters Congress so strongly intended an exclusive federal cause of action that what a plaintiff calls a state law claim is to be recharacterized as a federal claim." Fayard v. Ne. Vehicle Servs., LLC, 533 F.3d 42, 45 (1st Cir. 2008) (emphasis in original); see also Beneficial Nat'l Bank v. Anderson, 539 U.S. 1, 8 (2003).

-13-

often called "field preemption." SPGGC, LLC v. Ayotte, 488 F.3d 525, 530 (1st Cir. 2007). There is no field preemption here -- FitzGerald admits that the states play a significant role in the management of section 2(a)(ii) rivers.

FitzGerald instead relies upon the third category of preemption, "conflict preemption." Under that theory, "state law is . . . pre-empted to the extent it actually conflicts with federal law, that is, when compliance with both state and federal law is impossible, or when the state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." Good v. Altria Group, Inc., 501 F.3d 29, 47 (1st Cir. 2007) (quoting California v. ARC Am. Corp., 490 U.S. 93, 100-01 (1989)). Conflict preemption is particularly difficult to show when "the most that can be said about the state law is that the direction in which state law pushes [behavior] is in general tension with broad or abstract goals that may be attributed to . . . federal laws." L.H. Tribe, American Constitutional Law § 6-26, at 487 (2d ed. 1988); see also Pac. Gas & Elec. Co. v. State Energy Res. Conservation & Dev. Comm'n, 461 U.S. 190, 222-23 (1983); Commonwealth Edison Co. v. Montana, 453 U.S. 609, 634 (1981) (recognizing that "general expressions of 'national policy'" in a federal statute were insufficient to preempt state law).

FitzGerald asserts that there are two types of conflicts: first, he contends that the state statute generally stands as an

-14-

obstacle to accomplishing the purposes of the federal statute; second, he argues that it is impossible to comply with both the Maine statute and the language of 16 U.S.C. § 1273(b)(1) that "wild" rivers are to be "generally inaccessible except by trail."[3] He argues that the state law's requirement that there be eleven seasonal motor vehicle access points and six permanent bridges violates both the federal statute and the expressed intent of the 1970 federal approval of the AWW under the WSRA that the state authorize only temporary bridges for short-term logging purposes and that there be only two points of overland public access, located at either end of the AWW.

A.        Preemption by the WSRA

FitzGerald's broader preemption argument rests on the policy embodied by the WSRA in 16 U.S.C. § 1271

> that certain selected rivers of the Nation which, with their immediate environments, possess outstandingly remarkable scenic, recreational, geologic, fish and wildlife, historic, cultural, or other similar values, shall be preserved in free-flowing condition, and that they and their immediate environments shall be protected for the benefit and enjoyment of present and future generations.

---

[3] The access points described in Me. Rev. Stat. Ann. tit. 12, § 1882(1) allow vehicles to drive up to the edge of the watercourse. The access points in § 1882(2) to the short trails leading to the AWW permit vehicles within the following distances of the watercourse: 100 feet at Bissonette Bridge; 40 feet at Ramsey Ledge Campsite; 20 feet at Finley Bogan; and 10 feet at John's Bridge. Vehicles may also drive up to the water's edge at Indian Stream.

FitzGerald asserts that "the outstandingly remarkable value for the AWW is that it provides a wild condition for a wilderness canoe experience." He contends that the Maine statute threatens the wilderness condition of the AWW by permitting motor vehicle traffic close to the AWW and by installing six permanent bridges over the watercourse. Specifically, this level of accessibility, FitzGerald argues, is contrary to the WSRA's definition of a "wild" river area, which the statute specifies is one that is "generally inaccessible except by trail." Id. § 1273(b)(1).

Further, FitzGerald claims that the management plan embodied in Me. Rev. Stat. Ann. tit. 12, § 1882 is contrary to the state's duty under the WSRA "to protect and enhance" the special characteristics of the AWW that caused it to be included within the system of protected rivers. 16 U.S.C. § 1281(a) ("Each component of the national wild and scenic rivers system shall be administered in such manner as to protect and enhance the values which caused it to be included in said system without, insofar as is consistent therewith, limiting other uses that do not substantially interfere with public use and enjoyment of these values."). He argues that Maine's obligation "to protect and enhance" the wilderness character of the AWW is perpetual because the WSRA charges the states with "permanently" administering section 2(a)(ii) rivers as wild and scenic rivers. Id. § 1273(a)(ii).

These three arguments, based on FitzGerald's reading of the policy set forth in § 1271, on the management obligations in § 1281(a), and on the "permanently" language in § 1273(a)(ii), do not establish preemption. FitzGerald reads these phrases in isolation from the specific command in the text that the administration of section 2(a)(ii) rivers is to be "by an agency or political subdivision of the State or States concerned." Id. § 1273(a)(ii) (emphasis added). The WSRA does not mandate that states adopt management plans for section 2(a)(ii) rivers which meet any specific standard. Instead, the statute embraces flexibility as to management plans, recognizing that "[m]anagement plans for any such component may establish varying degrees of intensity for its protection and development, based on the special attributes of the area." Id. § 1281(a).

FitzGerald attempts to buttress his reading of the term "permanently" by pointing to Department of the Interior guidelines, which use the term "must":

> The values which cause the river to be qualified for the National System must be assured of permanent protection and management by or pursuant to State statute. . . . [T]he State must adopt a program of action which will provide permanent protection for the natural and cultural qualities of the river and adjoining lands.

45 Fed. Reg. 63,148, 63,149 (Sept. 23, 1980). But earlier departmental guidelines permit the reclassification or withdrawal of section 2(a)(ii) rivers. See U.S. Dep'ts of the Interior &

-17-

Agric., Guidelines for Evaluating Wild, Scenic and Recreational River Areas Proposed for Inclusion in the National Wild and Scenic Rivers System Under Section 2, Public Law 90-542 6 (1970). Thus, the rivers are not necessarily a permanent part of the system.

Maine is obligated to administer the AWW "in such manner as to protect and enhance the values which caused it to be included" in the system of protected rivers. Id. But the statute leaves the determination of how best to administer the AWW to meet those objectives to Maine. There is at most a disagreement between FitzGerald and the state regarding how best to administer the AWW to meet those ends. That sort of disagreement does not give rise to a viable claim of preemption.

The cases that FitzGerald cites as supporting his preemption argument all involve claims that federal authorities are violating the WSRA in the management of federally-administered rivers. See, e.g., Wilderness Watch v. U.S. Forest Serv., 143 F. Supp. 2d 1186 (D. Mont. 2000); Or. Natural Desert Ass'n v. Singleton, 75 F. Supp. 2d 1139 (D. Or. 1999). Those cases involve challenges to permits issued by federal agencies allowing certain usages of land along federally-administered rivers and are reviewed under the Administrative Procedure Act ("APA"). See, e.g., Wilderness Watch, 143 F. Supp. 2d at 1203. FitzGerald argues that this caselaw must be applied to state-administered rivers if the WSRA is to have any meaning, otherwise section 2(a)(ii) rivers will

-18-

receive a lesser level of protection.[4]  But that argument would require us to ignore the clear text of the federal statute and its recognition of state authority over state-administered wild rivers. See 16 U.S.C. § 1273(a)(ii).

Further, the WSRA defines a limited role for the federal government, a role primarily of cooperation with and assistance to the states in the management of section 2(a)(ii) rivers.  See id. § 1281(e) ("The States and their political subdivisions shall be encouraged to cooperate [with federal agencies] in the planning and administration of components of the system which include or adjoin State- or county-owned lands."); id. § 1283 ("The Secretary of the Interior, the Secretary of Agriculture, . . . or other department or agency head shall, where appropriate, enter into written cooperative agreements with the appropriate State or local official for the planning, administration, and management of Federal lands which are within the boundaries of any rivers for which approval has been granted under section 1273(a)(ii) of this title."); cf. id. § 1282(a) ("The Secretary of the Interior shall encourage and assist the States to consider . . . needs and opportunities for

---

    [4]    State administration does not necessarily make section 2(a)(ii) rivers any less protected than federally-administered rivers.  States have a strong incentive to manage their rivers in a manner consistent with their designation because, as discussed above, poor stewardship of a state-administered river could cause a state to lose its benefits of protection, assistance, and funding under the WSRA.  Further, FitzGerald is free to take his claims to the political branches of the state government in Maine and argue for greater protection for the AWW.

-19-

establishing State and local wild, scenic and recreational river areas.").

The WSRA does address preemption, but in ways distinctly unhelpful to FitzGerald.  Specific provisions of the WSRA limit any federal displacement of a state's authority over its section 2(a)(ii) rivers.  Even on federally-administered rivers (unless within a national park or monument), state jurisdiction over hunting and fishing laws is unaffected by the WSRA.  Id. § 1284(a).  With respect to state water rights, the WSRA is neither a claim nor denial on the part of the federal government of state jurisdiction over the waters of any included river.  Id. § 1284(d).  Moreover, the WSRA expressly disclaims preemption of a state's right to access the beds of component rivers.  Id. § 1284(f).  And the WSRA specifically prohibits federal condemnation of state-owned lands. Id. § 1277(a)(1).  The WSRA's overarching respect for a state's authority over its own designated rivers refutes FitzGerald's claim of conflict preemption.

B.        Preemption by Federal Agency Action

FitzGerald falls back on the proposition that the Maine statute is nonetheless preempted by federal agency action, even if not by the statute.  See Geier v. Am. Honda Motor Co., 529 U.S. 861 (2000).  The proposition that federal agency action, taken pursuant to its interpretation of a statute, may itself preempt is quite

correct. But a review of the interpretation of the WSRA by the relevant agencies further undercuts FitzGerald's preemption claim.

FitzGerald relies on correspondence from the National Park Service ("NPS") to the Army Corps of Engineers ("ACE") regarding Maine's request for permits from the ACE relating to the replacement of the Henderson Brook Bridge, one of the six bridges mentioned in Me. Rev. Stat. Ann. tit. 12, § 1882(4). We will assume, in FitzGerald's favor, that such correspondence can be pertinent federal regulatory action. In a letter dated June 29, 2007, Chysandra Walter, NPS Acting Northeast Regional Director, stated:

> [T]he State's 1970 application for federal designation, as well as the applicable state statutes upon which that application and today's management are based, highlight the affirmative responsibility of the State to manage the Allagash Wilderness Waterway for wilderness recreational opportunities, and to affirmatively develop "maximum wilderness character."
> . . . .
> The State of Maine . . . is responsible for managing and administering the Allagash Wilderness Waterway in a manner consistent with the Wild and Scenic Rivers Act. In addition to issues associated with Section 7 (federally assisted water resource development projects) and Section 2 (classification) that have been noted above, all administering agencies have the responsibility to further the purposes of the Act as articulated in Section 1 (purposes) and Section 10 (management direction).

Later, NPS Northeast Regional Director Dennis R. Reidenbach wrote in a letter dated November 15, 2007:

As a river designated as a component of the National Wild and Scenic Rivers System under Section 2(a)(ii) of the Act (16 U.S.C. § 1273(a)(ii)), the State of Maine is responsible for administering the Allagash Wilderness Waterway in "such manner as to protect and enhance the values which cause it to be included in [the System]" pursuant to Section 10 of the Act (16 U.S.C. § 1281(a)).

FitzGerald argues that these statements from the NPS form an independent basis for preemption. But these statements provide no stronger basis for preemption than the text of the WSRA itself. The sections of the NPS letters upon which FitzGerald relies do little more than recite the text and structure of the WSRA.

Indeed, the record of federal regulatory action under the WSRA undercuts FitzGerald's preemption argument. Even before the issue of the permit for the Henderson Brook Bridge arose, the guidelines issued by the Departments of the Interior and Agriculture recognized that the management policies for rivers under the WSRA may vary depending upon whether the river is state- or federally-administered. See 47 Fed. Reg. 39,454, 39,459 (Sept. 7, 1982) ("Managing agencies will implement [the principles from section 10(a) of the WSRA] to the fullest extent possible under their general statutory authorities and existing Federal, State and local laws. Because of these limitations, however, implementation of the principles may differ among and within components of the system depending on whether the land areas involved are federally, State, locally or privately owned.").

Reports from the Interagency Wild and Scenic Rivers Coordinating Council also recognize that the WSRA is deferential to the states regarding the management of section 2(a)(ii) rivers. See, e.g., Interagency Wild & Scenic Rivers Coordinating Council, Protecting Resource Values on Non-Federal Lands 4 (1996), available at http://www.rivers.gov/publications/non-federal-lands-protection.pdf ("[T]here are no explicit standards for resource protection on non-federal lands in the [WSRA] or Interagency Guidelines."); Interagency Wild & Scenic Rivers Coordinating Council, A Compendium of Questions and Answers Relating to Wild and Scenic Rivers 42 (1997), available at http://www.rivers.gov/publications/q-a.pdf ("Although the [WSRA] includes provisions encouraging the protection of river values through state and local government land use planning, there are no binding provisions on local governments.").

Moreover, as to the AWW itself, the federal regulatory action regarding the ACE permit for the Henderson Brook Bridge contradicts FitzGerald's claim of preemption. Indeed, Reidenbach's November 15, 2007 letter, on which FitzGerald relies, went on to say: "The State of Maine is responsible for deciding how to best administer the Allagash Wilderness Waterway to protect and enhance the values which caused it to be designated under Section 10 of the Act." He determined that "[b]ecause the bridge existed at the time of the Waterway's classification as 'wild,' we conclude that

-23-

replacing the bridge as proposed by the Bureau will not degrade the Waterway's 'wild' character as compared to the condition at the time of designation (and existing presently)," noting that the WSRA "does not require that a water resources project enhance the wilderness character of a wild river area."

Additionally, on October 9, 2007, the ACE issued a permit to Maine for the work relating to the Henderson Brook Bridge without noting any objections from any of the federal agencies concerned.[5]  Because both the NPS and the ACE approved Maine's plans for the Henderson Brook Bridge, it cannot be said that the Maine statute authorizing the permanent bridges over the AWW is preempted by federal agency action.

III.

The judgment of dismissal is <u>affirmed</u>.

---

[5]    FitzGerald could have challenged the ACE permit under the APA but did not.

-24-