# United States Court of Appeals
## For the First Circuit

---

No. 08-2440

WEAVER'S COVE ENERGY, LLC,

Plaintiff, Appellee,

v.

RHODE ISLAND COASTAL RESOURCES MANAGEMENT COUNCIL; MICHAEL M.
TIKOIAN, in his capacity as Chairman of the Rhode Island Coastal
Resources Management Council; PAUL E. LEMONT, in his capacity as
Vice Chairman of the Rhode Island Coastal Resources Management
Council; THOMAS RICCI; DAVID ABEDON; DONALD GOMEZ; K. JOSEPH
SHEKARCHI; NEIL GRAY; W. MICHAEL SULLIVAN; RAYMOND C. COIA; GERALD
P. ZARRELLA; BRUCE DAWSON; in their capacities as Members of the
Rhode Island Coastal Resources Management Council,

Defendants, Appellants.

---

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

[Hon. William E. Smith, U.S. District Judge]

---

Before

Lynch, Chief Judge,
Torruella and Ripple,[*] Circuit Judges.

---

Michael Rubin, Assistant Attorney General, with whom Patrick
C. Lynch, Attorney General of the State of Rhode Island, Paul J.
Roberti, Assistant Attorney General, Brian A. Goldman, and the
Goldman Law Offices were on brief for the appellants.
Carol Iancu, Assistant Attorney General, and Martha Coakley,
Attorney General of Massachusetts, on brief for the Commonwealth
of Massachusetts and the City of Fall River, amicus curiae.

---

[*] Of the Seventh Circuit, sitting by designation.

Bruce F. Kiely, with whom Adam J. White, Baker Botts L.L.P., Gregory L. Benik, and Benik and Associates P.C. were on brief for the appellees.

October 26, 2009

**LYNCH**, <u>Chief Judge</u>.  The Rhode Island Coastal Resources Management Council ("CRMC") challenges a decision by the federal district court, which has rejected two regulatory barriers CRMC imposed to plans to build a Liquified Natural Gas ("LNG") terminal in the City of Fall River with a berth in Massachusetts coastal waters of Mount Hope Bay.  Weaver's Cove Energy, LLC ("Weaver's Cove") is the sponsor of the LNG terminal.  <u>Weaver's Cove Energy, LLC</u> v. <u>R.I. Coastal Res. Mgmt. Council</u>, 583 F. Supp. 2d 259 (D.R.I. 2008).  The barriers, which CRMC has attempted to impose, are to necessary dredging by Weaver's Cove in Rhode Island navigable waters, in a federal navigation channel.  The Federal Energy Regulatory Commission ("FERC") generally approved the project in 2005, subject to certain conditions.  Until those conditions are met, Weaver's Cove cannot start construction.  The Commonwealth of Massachusetts, joined by the City of Fall River, has filed a brief as amicus curiae in support of CRMC.

We address three main issues.  The first is whether we have Article III jurisdiction to decide these matters.  The second is whether the district court erred in holding that CRMC's failure to respond within six months to Weaver's Cove's application for federal consistency review requires there be a presumption of concurrence in the project, pursuant to 16 U.S.C. § 1456(c)(3)(A) of the Coastal Zone Management Act of 1972 ("CZMA").  The third is whether CRMC's use of its state law licensing program for

-3-

alterations to the coast, 04-000-010 R.I. Code R. §§ 100.1, 300.1, to block the project is preempted by the Natural Gas Act ("NGA").

For the reasons set forth below, we affirm the district court's decision.

I.

We first briefly explain the regulatory framework that governs this case.

Central to this dispute are two federal statutes, the NGA, 15 U.S.C. §§ 717-717z, and the CZMA, 16 U.S.C. §§ 1451-66. The NGA was originally passed in the 1930s to facilitate the growth of the energy-transportation industry and requires FERC authorization for the importing of natural gas. 15 U.S.C. § 717b(a). FERC's authority under the to NGA to regulate facilities engaged in the import of natural gas has long been interpreted as "plenary and elastic," Distrigas Corp. v. Federal Power Comm'n, 495 F.2d 1057, 1064 (D.C. Cir. 1974), and courts have interpreted the NGA to preempt state regulatory authority within the scope of FERC's jurisdiction, see, e.g., Schneidewind v. ANR Pipeline Co., 485 U.S. 293 (1988). Following a 2005 amendment, the NGA explicitly grants FERC "exclusive authority to approve or deny an application for the siting, construction, expansion, or operation of an LNG terminal." Id. § 717b(e)(1). Parties wishing to build an LNG terminal must file an extensive application with FERC, 18

-4-

C.F.R. § 157.6, which must then consult with states regarding safety and environmental questions, 15 U.S.C. § 717b-1(b).

The NGA creates a consolidated regulatory process for approving LNG facilities that maintains the role of federal agencies and, in circumscribed areas, state agencies. It does so by limiting FERC's exclusive authority in two ways relevant to this case. First, the NGA, except where expressly provided, does not affect "any Federal agency's authorities or responsibilities related to LNG terminals." Id. § 717b(e)(1) (emphasis added). In addition, the NGA explicitly states that, unless otherwise provided, it does not affect the rights of states under three federal regulatory statutes, of which only the CZMA is pertinent to this case. Id. § 717b(d)(1).

The CZMA establishes the relationship between state bodies, like the Rhode Island CRMC, and federal agencies during the permitting process for LNG terminal construction projects that impact coastal zones. It provides states with a limited opportunity to review applications to ensure they are consistent with state regulations, 16 U.S.C. § 1456(c)(3)(A), and, in doing so, grants states "a conditional veto over federally licensed or permitted projects," Weaver's Cove, 583 F. Supp. 2d at 267. That conditional veto, however, is itself subject to review.

In order to conduct a consistency review, state agencies must first have obtained approval from the federal National Oceanic

-5-

Atmospheric Administration ("NOAA"), a Department of Commerce agency, for the state agency's own coastal management plan. 16 U.S.C. §§ 1454, 1455(d)-(e), 1456(c)(3)(A). Coastal management plans set forth general state policies for developing and maintaining coastal areas and, as is the case in Rhode Island, may include not only the conditions for federal consistency review but also for state licensing programs.

Once a state coastal management plan has been approved, an applicant for a federal permit wishing to undertake any activity the state plan regulates must certify with the local agency that the proposed activity is consistent with the coastal management plan.[1] Id. § 1456(c)(3)(A). In support of the application, the applicant must submit all "necessary data and information" identified in the coastal management plan. 15 C.F.R. § 930.58(a)(2). Under federal law, the state agency has thirty days from the time the application was submitted to notify the applicant and the federal agency if it takes the position that the applicant has failed to submit all of the required information. Id. § 930.60(a)(2).

Importantly, the CZMA limits the time a state may conduct such a review, in order to prevent frustration of federal purposes.

---

[1] A state is prohibited from undertaking interstate consistency review of activities occurring in a different state unless the state requests and obtains interstate review authority from NOAA. 15 C.F.R. § 930.154(e).

-6-

Whether CRMC failed to act within this limit is a key issue in this case. Once an applicant submits its consistency certification, the state agency has six months either to concur with the certification or to object if it concludes that the proposed activity is inconsistent with the coastal management plan. 16 U.S.C. § 1456(c)(3)(A). If the state agency fails to respond within six months, the state's concurrence will be "conclusively presumed." Id. If the application is incomplete and the state agency so informs the applicant within the required thirty-day time period, "the State agency's six-month review period will commence on the date of receipt of the missing necessary data and information." 15 C.F.R. § 930.60(a)(2). However, the state agency's review of whether the application is complete "is not a substantive review of the adequacy of the information received," and the agency's request for clarification of the information provided or its assertion that the information is "substantively deficient" does not toll the six-month review period. Id. § 930.60(c). These rules encourage states to act quickly when reviewing applications so that no one state can delay the federal approval process. Congress was sufficiently concerned about the ability of local state agencies to delay projects that it did not use a generalized standard, such as "a reasonable period of time" as it did, for instance, in the Telecommunications Act of 1996, 47 U.S.C. § 332(c)(3)(B), but capped the time at six months.

The CZMA also limits state authority to delay or prohibit projects subject to consistency review, by providing for federal review of state agency determinations. If the state agency objects to consistency certification, the applicant may appeal the decision to the Secretary of Commerce, who can override the objection on a finding "that the activity is consistent with the objectives of this chapter or is otherwise necessary in the interest of national security." 16 U.S.C. 1456(c)(3)(A). The Secretary's decision, in turn, may be reviewed in federal district court.[2] See, e.g., Millennium Pipeline Co., L.P. v. Gutierrez, 424 F. Supp. 2d 168, 173-74 (D.D.C. 2006).

One other federal statute relevant to this case is the Rivers and Harbors Act, at section 10. 33 U.S.C. § 403. It prohibits construction or other work, such as dredging, in navigable U.S. waters without congressional authorization or a recommendation by the Army Corps Chief of Engineers as well as the Secretary of the Army's authorization. Id. Because FERC's exclusive authority under the NGA does not disturb the Army Corps's authority under the Rivers and Harbors Act, 15 U.S.C. § 717b(e)(1), parties seeking FERC approval for LNG terminal proposals that

_____

[2] A state may reopen review of a certification if the applicant makes a "major amendment" to the project. 15 C.F.R. §§ 930.51(b)-(c), (e), 930.66(b). That provision is inapplicable here.

include dredging in navigable waterways, like Weaver's Cove, must also apply for approval from the Army Corps.

In Rhode Island, the federally designated agency under the CZMA is the appellant, CRMC. CRMC is responsible for administering Rhode Island's coastal management plan, the Rhode Island Coastal Resources Management Program ("CRMP"). When a party wishes to conduct an activity listed in the CRMP, such as dredging in Rhode Island, under state law, that party should obtain from the CRMC a state law license called an "Assent." 04-000-010 R.I. Code R. § 100.1. The more extensive "Category B Assent" process under state law is required for approval of all projects that involve major alterations proposed for Rhode Island tidal waters, shoreline features, or areas contiguous with shoreline features. Id. §§ 100.1(A), (D), 300.1. If the party's proposed listed activity is also part of a project that is subject to federal licensing, CRMC is the body tasked with providing the required federal consistency review.

CRMC's document, labeled the Federal Consistency Manual, emphasizes that although the Assent and consistency review processes may overlap, they are distinct approvals. R.I. Coastal Res. Mgmt. Council, Federal Consistency Manual 7, available at http://www.crmc.ri.gov/regulations/Fed_Consistency.pdf. The same list of activities that require Assents also require consistency review. Id. at 12. Major alterations to the Rhode Island coastal

area that trigger the more extensive Category B Assent process trigger the same level of review for consistency certifications. Id. at 8.

Finally, the manual states that a grant or denial of an Assent in an application when a consistency review is ongoing constitutes a concurrence or an objection for the purposes of the review. Id. at 13. A key difference between the two forms of review is that whereas the CZMA limits consistency review through the six-month time limit, administrative review by the Secretary of Commerce, and federal judicial review, no federal statute limits how long state decisions regarding Category B Assent may take or provides for federal review.

The substantive provision of the state CRMP most pertinent to this case is section 300.9(C), which requires approval by the CRMC for all dredging activities. Particularly in dispute in this case is the meaning of section 300.9(C)(7) of the CRMP, which requires that "[w]hen disposal is proposed for approved upland facilities, the applicant shall provide a letter of acceptance from that facility, unless the disposal is approved for the central landfill." 04-000-010 R.I. Code R. § 300.9(C)(7).

The CRMC also coordinates some of its responsibilities with another state agency, the Rhode Island Department of Environmental Management ("RIDEM"). Particularly relevant to this case is RIDEM's role in identifying a list of approved upland sites

for disposal of dredged material, which CRMC is responsible for incorporating into a comprehensive plan for dredged material management.  R.I. Gen. Laws § 46-6.1-5.

II.

Weaver's Cove proposes to build and operate a LNG terminal in Fall River.  The proposed project received FERC approval in 2005, subject to certain conditions.[3]  Weaver's Cove Energy, LLC, 112 F.E.R.C. ¶ 61,070, at 61,528 (2005).  FERC found that the proposal "will promote the public interest by increasing the availability of natural gas supplies in the New England market."  Id.

Under the original LNG proposal, submitted in 2003, ships carrying LNG would pass through waters in both Rhode Island and Massachusetts, traveling up the Taunton River to the terminal location.  This has changed.  According to Weaver's Cove's 2009 "Offshore Berth Amendment," the proposal now calls for ships to deliver their cargo to an offshore berth in Mount Hope Bay, from which the LNG would be transported via a submerged pipeline to the onshore terminal.  The offshore berth, the pipeline, and the terminal would all be located in Massachusetts.  In both the

---

[3]    LNG, produced by cooling natural gas to a liquid state, has less volume and so can be more economically transported.  The terminal proposed by Weaver's Cove would receive imported LNG from tanker ships, regasify it, and inject it into the U.S. natural gas grid.  According to Weaver's Cove, the proposed terminal would supply fifteen percent of New England's "peak day" natural gas demand in 2010.  Weaver's Cove, 583 F. Supp. 2d at 262-63, 262 n.2.

original proposal and the amended version, the only planned activity in Rhode Island waters is dredging in a federal navigation channel to ensure the safe passage of the LNG tankers. That dredging is the subject of this litigation.

On December 19, 2003, Weaver's Cove filed an application, pursuant to the NGA, for FERC approval of the proposed LNG facility. FERC, as said, approved the application in 2005 subject to a number of conditions, one of which was that Weaver's Cove was to "file . . . **prior to construction** documentation of concurrence from the [CRMC] that the project is consistent with the Rhode Island [CRMP]." Weaver's Cove Energy, LLC, 112 F.E.R.C. at ¶¶ 61,550-51 (emphasis in original).

Turning to state regulatory requirements, such as Category B Assent, FERC added that "state or local permits issued with respect to the jurisdictional facilities authorized herein must be consistent with the conditions in this order." Id. at ¶ 61,546. Although FERC encouraged Weaver's Cove and local authorities to cooperate during local review of Weaver's Cove's proposal, it made clear that "this does not mean that state and local agencies, through application of state or local laws, may prohibit or unreasonably delay the construction or operation of facilities approved by this Commission." Id.

Following cross-motions for rehearing, FERC reaffirmed this order in 2006 in all respects relevant to this case. Weaver's

Cove Energy, LLC, 114 F.E.R.C. ¶ 61,058, at 61,164 (2006). This court declined then to review the conditional order on ripeness grounds. City of Fall River v. Fed. Energy Regulatory Comm'n, 507 F.3d 1, 6 (1st Cir. 2007).

Because the proposed dredging activities also required approval from the Army Corps under the Rivers and Harbors Act, Weaver's Cove filed an application to the Army Corps on March 18, 2004. Dredging is a listed activity in Rhode Island's federally approved CRMP. 04-000-010 R.I. Code R. § 300.9. On filing its application to the Army Corps, Weaver's Cove was therefore also required by the CZMA to file a consistency certification with CRMC, which it did in July 2004. With this application, Weaver's Cove also applied for Rhode Island's state law license for dredging, Category B Assent. However, Weaver's Cove informed CRMC that it believed the Assent unnecessary.

Within the thirty-day window to inform applicants for concurrence that their applications are incomplete required by the CZMA, CRMC informed Weaver's Cove by phone that its consistency certification and Category B Assent application were, in CRMC's view, incomplete on two grounds. The validity of those grounds is at issue in this case. The first, quickly remedied by Weaver's Cove, was that it had failed to submit the engineering plans with the stamp of a Rhode Island engineer. The second ground, at issue in this case, was that Weaver's Cove's application was incomplete,

-13-

and so the six-month clock was not ticking, because Weaver's Cove had failed to provide documentation, pursuant to section 300.9(C)(7) of the CRMP, that dredged materials would be accepted by "an approved upland facilit[y]." In a letter dated August 2, 2004, Weaver's Cove replied that because the dredged materials were to be disposed of in Massachusetts, and not in Rhode Island, section 300.9(C)(7) of the CRMP did not apply. On August 26, 2004, CRMC responded, informing Weaver's Cove that its application was still incomplete because it failed to file a Water Quality Certificate but making no mention of the upland disposal issue. After additional communications, the parties failed to resolve the dispute. Because it claimed to lack necessary data and information, CRMC did not commence review of Weaver's Cove's consistency certification or its Category B assent. It still has not done so. In short, as of this date, the appellant state agency has not acted on the merits of an application which has been pending before it since July 2004.

Over a year after its original application to CRMC, Weaver's Cove made separate filings to NOAA, FERC, and the Secretary of Commerce, requesting a determination that CRMC's concurrence be "conclusively presumed" because CRMC had failed to act on Weaver's Cove's application within the statutorily required six-month deadline. 16 U.S.C. § 1456(c)(3)(A). NOAA took no action, FERC concluded it did not have authority to address the

-14-

issue, and the Secretary of Commerce determined that he could not review the matter without an actual objection from CRMC. This left the matter of whether CRMC's concurrence should be conclusively presumed to the courts for resolution.

Weaver's Cove filed suit in the U.S. District Court for the District of Rhode Island on June 29, 2007. It sought declaratory and injunctive relief, claiming that the disposal information and the water quality certification, which the appellant CRMC had requested, were not "necessary data and information," as required by the CZMA. Weaver's Cove asserted the CZMA's six-month deadline should not be tolled and CRMC's concurrence should be conclusively presumed. In an amended complaint, Weaver's Cove also argued that Category B Assent was preempted by provisions of the NGA that grant FERC "exclusive authority" in approving LNG facilities, 15 U.S.C. § 717b(e)(1), and unlawful under the dormant Commerce Clause.

The district court granted summary judgment in favor of Weaver's Cove, on both the CZMA and the NGA claims. Weaver's Cove, 583 F. Supp. 2d at 262. The court found that neither the disposal information, nor the water quality certificate were necessary data and information, and so Weaver's Cove application was not incomplete. Id. at 272-73. Thus, CRMC had failed to meet the statutory deadline and its concurrence was conclusively presumed. Id. at 275. In particular, with respect to the disposal

information, the court found, based on statutory interpretation and the interpretation which the other state agency of Rhode Island, RIDEM, had adopted, that the term "approved upland facilities" in section 300.9(C)(7) of the CRMP referred only to disposal facilities in Rhode Island. Weaver's Cove, 583 F. Supp. 2d at 270-75. Since Weaver's Cove intended to dispose of the dredged material out of state (in Massachusetts) at that time,[4] the court concluded that CRMC could not require proof that the material would be accepted. Id. The district court, acting under the NGA, also held the Category B Assent process utilized by CRMC was preempted on three grounds. First, it found the process expressly preempted by the language of 15 U.S.C. § 717b(3)(1), granting FERC "exclusive authority to approve or deny an application" to build an LNG terminal. Weaver's Cove, 583 F. Supp. 2d at 280-83. Second, the court found the assent process implicitly field preempted because "Congress clearly intended that the NGA occupy the entire field of LNG regulation." Id. at 283-84. Finally, the district court found the Category B Assent process preempted here because it specifically conflicted with FERC's jurisdiction to regulate LNG facilities. Id. at 284-85. The court also held that the case was not rendered moot by the changes in the project that occurred after

---

[4] The original proposal to the Army Corps set forth a Massachusetts disposal site but also considered offshore disposal at a federal ocean disposal site approved by the Environmental Protection Agency and the Army Corps.

the date Weaver's Cove submitted its consistency certification. Id. at 275-76. It did not reach the dormant Commerce Clause question.

III.

A.        Jurisdiction

We first hold that we have jurisdiction to hear this case. CRMC does not raise any challenge to standing, mootness, or ripeness.[5] Massachusetts, in its brief amicus curiae to this court (but not to the district court), argues broadly that there is no case or controversy here, based on standing, mootness, and lack of ripeness. Amici cannot insert new arguments, not made by a party, into a case. Pharm. Research & Mfrs. of Am. v. Concannon, 249 F.3d 66, 74 n.5 (1st Cir. 2001). Nonetheless, we review standing, mootness, and ripeness in the constitutional sense to see whether we have Article III jurisdiction because we are independently obligated to do so, regardless of whether the parties raise the issue. Pagan v. Calderon, 448 F.3d 16, 26 (1st Cir. 2006). For the reasons discussed below, we are satisfied we have jurisdiction.

We first address standing. Massachusetts asserts that because Weaver's Cove has not shown that a decision in their favor

_____

[5]        Because CRMC has not itself challenged the district court's finding with respect to mootness, we do not address CRMC's challenge to the jurisdictional questions raised in footnote 18 of the district court's opinion. In re Williams, 156 F.3d 86, 90 (1st Cir. 1998) ("[F]ederal appellate courts review decisions, judgments, orders, and decrees--not opinions, factual findings, reasoning, or explanations.").

-17-

"will relieve a discrete injury" to them, Weaver's Cove lacks standing. Massachusetts v. EPA, 549 U.S. 497, 525 (2007) (quoting Larson v. Valente, 456 U.S. 228, 243 n.15 (1982)) (internal quotation marks omitted). It argues that "events completely unrelated to CRMC's regulatory processes" have prevented the project from proceeding. Massachusetts is not entirely clear in explaining what those events are, but its brief's earlier description of the project suggests it is referring to challenges Weaver's Cove has faced in satisfying other state and federal permitting requirements. Because CRMC's regulatory requirements do affect Weaver's Cove's ultimate ability to receive federal approval, we conclude that Weaver's Cove has standing.

A plaintiff wishing to establish standing must show "a concrete and particularized injury in fact, a causal connection that permits tracing the claimed injury to the defendant's actions, and a likelihood that prevailing in the action will afford some redress for the injury." City of Bangor v. Citizens Commc'ns Co., 532 F.3d 70, 92 (1st Cir. 2008) (quoting Me. People's Alliance & Natural Res. Def. Council v. Mallinckrodt, Inc., 471 F.3d 277, 283 (1st Cir. 2006)) (internal quotation marks omitted). The plaintiff need not show that "the defendant's actions are the very last step in the chain of causation" for the injury. Bennet v. Spear, 520 U.S. 154, 169 (1997). It suffices if the plaintiff can show

"injury produced by determinative or coercive effect upon the action of someone else." Id.

In this case, CRMC's actions have directly affected the federal regulatory processes that determine whether the LNG terminal project can proceed. Consistency review is a condition for FERC approval, and FERC has stated it has no authority to address CRMC's refusal to act.[6] While CRMC's inaction may not be the exclusive reason federal approval has not been granted, it is clear that failure to obtain concurrence from CRMC has a "determinative or coercive effect" on the federal agencies. Bennet, 520 U.S. at 169. Weaver's Cove therefore has standing to make its CZMA-related claims.

In addition, Weaver's Cove has standing to make its preemption claims because it suffers a concrete injury from Rhode Island subjecting it to a preempted state law. Even if CRMC's concurrence in Weaver's Cove's consistency certification were presumed, Category B Assent would still bar LNG construction if we did not address it here. This "would impose a palpable and considerable hardship" on its project. Pac. Gas & Elec. Co. v. State Energy Res. Conservation & Dev. Comm'n, 461 U.S. 190, 201-02 (1983).

---

[6] The Army Corps also requires Weaver's Cove to submit verification that its application to CRMC is complete before it can complete its review.

This case is not rendered moot by Weaver's Cove's failure to achieve complete regulatory approval for its original proposal or by its submission of the Offshore Berth Amendment. "[A] case is moot when the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome." Powell v. McCormack, 395 U.S. 486, 496 (1969). We will only find a case moot if an intervening event "makes it impossible for the court to grant any effectual relief." Gulf of Me. Fisherman's Alliance v. Daley, 292 F.3d 84, 88 (1st Cir. 2002) (quoting Church of Scientology v. United States, 506 U.S. 9, 12 (1992)) (internal quotation marks omitted).

Weaver's Cove's efforts to obtain regulatory approval for the LNG terminal from all of the relevant actors do indeed constitute a live issue. These efforts are ongoing and the Offshore Berth Amendment represents an attempt by Weaver's Cove to address some of the concerns that may have earlier delayed approval. While Weaver's Cove still has conditions to meet following the amendment, Weaver's Cove did, for example, get approval from the Coast Guard, which previously had been a hurdle. Since CRMC's consistency certification remains a requirement of FERC and of the Army Corps, that question is clearly live. This is especially so because the Offshore Berth Amendment itself does not render moot the dispute here with Rhode Island. As the Army Corps has itself noted, the planned dredging activities in Rhode Island

-20-

have not changed, even under the amendment.[7]  A decision in favor of the plaintiff in this case would provide "effectual relief" because it would clear a barrier to achieving approval for the project.

This case is also ripe.  Although federal regulatory approval for the Offshore Berth Amendment is ongoing, our review of this case is neither "advisory" nor "irrelevant to the ultimate approvability of the project."  Fall River, 507 F.3d at 8.

Massachusetts cites Fall River in an attempt to argue that this case will lack ripeness until the project receives authorization from several key federal agencies.  But it disregards important differences in the facts and procedural background of this case.  In Fall River, we held that a challenge to FERC's conditional approval of this project was not ripe because the decision was not final until the completion of reviews by the United States Coast Guard and the Department of the Interior.  Id. at 7.  Because FERC's decision was not final we could not be sure our opinion would not be advisory.  Id. at 7-8.  In contrast, the plaintiff's requested relief in this case would be final.  CRMC's consistency review and Category B Assent requirements would cease

---

[7]  We affirm the district court's holding that the Offshore Berth Amendment does not affect CRMC's consistency review. Weaver's Cove, 583 F. Supp. 2d at 275-78.  That FERC is reviewing the Offshore Berth Amendment is irrelevant and does not moot this appeal regarding findings by a Rhode Island agency.  What effect that amendment may have on dredging activities in Massachusetts is not at issue before us.

to be barriers to ultimate approval of the project. Another difference from <u>Fall River</u> is that FERC and the other relevant agencies have expressly declined to resolve the issue raised by this appeal on the grounds that they have no authority to do so. It is true that resolutions of these issues might not secure the project's ultimate approval, but it would neither be "advisory" nor "irrelevant."

B.      <u>CZMA Consistency Review: "Conclusive Presumption of Concurrence"</u>

We hold that CRMC's concurrence with Weaver's Cove's dredging plans must be conclusively presumed under 16 U.S.C. § 1456(c)(3)(A). We affirm the district court. <u>Weaver's Cove</u>, 583 F. Supp. 2d at 270-75.

A district court may grant summary judgment on a finding that "there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). "An issue is genuine 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party,' and a fact is material if it has the 'potential to affect the outcome of the suit.'" <u>Velázquez-García</u> v. <u>Horizon Lines of P.R., Inc.</u>, 473 F.3d 11, 15 (1st Cir. 2007) (quoting <u>Anderson</u> v. <u>Liberty Lobby, Inc.</u>, 477 U.S. 224, 248 (1986); <u>Santiago-Ramos</u> v. <u>Centennial P.R. Wireless Corp.</u>, 217 F.3d 46, 52 (1st Cir. 2000)) (citation omitted). On appeal, we review a district court's grant of summary

judgment de novo. Torrech-Hernandez v. General Elec. Co., 519 F.3d 41, 46 (1st Cir. 2008).

We review the district court's holding that, in this case, a letter certifying acceptance of dredged material, as listed in section 300.9(C)(7) of the CRMP, did not constitute necessary data and information within the meaning of 15 C.F.R. § 930.58(a)(2) because Weaver's Cove did not intend to dispose of the waste in Rhode Island.[8] Weaver's Cove, 583 F. Supp. 2d at 271-72. If, as CRMC contends, the letter is necessary data and information required by the CRMP, CRMC is not compelled to commence reviewing the consistency certification until Weaver's Cove provides it. 15 C.F.R. § 930.60(a)(2). The six-month deadline for presumed concurrence would be tolled until that time. Id. If, on the other hand, the letter is not necessary data and information, as the district court found, the six-month period from Weaver's Cove's submission of the consistency certification in July 2004 has clearly expired, and we are required to find CRMC's concurrence

---

[8] We note that Weaver's Cove no longer intends to dispose of the dredged materials at any "upland facilit[y]" and instead now plans to dispose of the waste at an offshore site. As CRMC points out in its reply brief, this was not the case at the time of the original consistency review application. Weaver's Cove at that time planned to dispose of the waste at its Fall River Facility. We do not address this change, because it occurred after the time concurrence would have been presumed, and neither party has raised it on appeal.

-23-

presumed.  16 U.S.C. § 1456(c)(3)(A).  We affirm the district court's conclusion.

As the district court noted, the state CRMP does not define "approved upland facilit[y]."  Weaver's Cove, 583 F. Supp. 2d at 271.  However, other Rhode Island laws have shed light on the language's meaning.  Rhode Island's Marine Waterways and Boating Facilities Act of 2001 ("Waterways and Boating Act"), R.I. Gen. Laws §§ 46-6.1-1 to -10, and associated regulations, set forth a comprehensive system regulating dredging activities and disposal of dredged materials in the state.  The district judge relied on these regulations to conclude that facilities outside of Rhode Island are not among the "approved upland facilities" from which the CRMP requires a letter of acceptance.  Weaver's Cove, 583 F. Supp. 2d at 271-72.

We agree with the district court that the language of section 300.9(C)(7) of the CRMP can only be read to cover facilities located in the state of Rhode Island because the state's regulatory framework for dredging only provides for the identification of "approved upland facilities" within the state.

We begin with the Rhode Island statutes that govern regulation of dredging in the state.  Rhode Island law makes the CRMC responsible for "prepar[ing], adopt[ing] and maintain[ing] . . . a comprehensive plan for dredged material management for dredging that takes place in the coastal zone."  R.I. Gen. Laws.

§ 46-6.1-5(a). But the same statute delegates to RIDEM the task of "adopt[ing] by rule a list of upland sites and types of areas suitable for beneficial use and disposal of dredged materials." Id. § 46-6.1-5(b). This list is then "incorporated in the [CRMC's] comprehensive plan for dredged material management." Id. The Waterways and Boating Act does not define "upland sites," but it does define "[u]pland areas" as "areas that are not in the coastal zone." Id. § 46-6.1-4(16). Thus, while both agencies may be responsible for interpreting whether "upland disposal facilities" can include out of state disposal facilities, only RIDEM is charged with approving upland sites.

RIDEM has in turn promulgated its own Rules and Regulations for Dredging and the Management of Dredged Material ("Dredging Regulations") pursuant to the Waterways and Boating Act. R.I. Dept. of Envtl. Mgmt., Rules and Regulations for Dredging and the Management of Dredged Material § 2, available at http://www.dem.ri.gov/pubs/regs/regs/water/dred0203.pdf [hereinafter "R.I. Dredging Regulations"]. These regulations are also intended to be consistent with the CZMA, id., and must be implemented according to a written protocol jointly adopted by CRMC and RIDEM, id. § 3. Among the stated purposes of these regulations is to "[i]dentify and list upland sites suitable for beneficial use and/or disposal of dredged material," id. § 1.5, and, as the district court noted, the Dredging Regulations "apply to all

-25-

aspects of dredging proposed in marine waters of the State of Rhode Island," id. § 3. The Dredging Regulations do not contain an express definition for "approved upland facilities," but they do define "Upland Areas" more narrowly than the corresponding term in the Waterways and Boating Act, R.I. Gen. Laws § 46-6.1-4(16), as "[a]ll areas of the state that are not in the coastal zone." R.I. Dredging Regulations § 4.20 (emphasis added).

Since RIDEM is tasked with approving upland disposal facilities, R.I. Gen. Laws § 46-6.1-5(b), and it only approves upland facilities within the state of Rhode Island, R.I. Dredging Regulations § 4.20, it follows that the "approved upland facilities" referred to by section 300.9(C)(7) of the CRMP should be read to be facilities within the state of Rhode Island. "To hold otherwise would render the C[R]MP's specific language a nullity." Weaver's Cove, 583 F. Supp. 2d at 272.

In any event, appellant has not pointed to any regulatory process for the approval of upland sites outside of Rhode Island, nor has it produced a list of approved facilities outside of the state. Absent language in Rhode Island law to the contrary, we presume state laws, like this one, not to have extraterritorial effect. Cf. Carnero v. Boston Sci. Corp., 433 F.3d 1, 7 (1st Cir. 2006).

CRMC responds that it has an interest in confirming that material dredged from its coast is properly disposed, regardless of

-26-

the ultimate location, and that the district court improperly relied on another agency's interpretation of the Waterways and Boating Act, which it administers. Citing language from both the Waterways and Boating Act, R.I. Gen. Laws § 46-6.1-3(1), and the CRMC's organic statute, id. § 46-23-1(e), that designate CRMC as the "lead agency" for purposes of regulating dredging activities, CRMC argues that federal courts must defer to its broader interpretation of its own regulations for its own purposes. It explains that although RIDEM may, in its limited role of approving disposal sites, only be concerned with upland facilities within Rhode Island, CRMC is more broadly concerned with ensuring the proper disposal of dredged material.[9]

CRMC cites no authority in support of its view, and in this context, the view is untenable. Since for the purposes of CZMA consistency review, we are only concerned with the requirements of the CRMP, CRMC's argument that it is entitled to deference in its interpretation of the Waterways and Boating Act is inapposite. We are concerned only with its interpretation of

---

[9] Thus, in order to prevent a hypothetical "trash barge to nowhere scenario," in which Rhode Island is forced to dispose of dredged material that no one else will accept, CRMC is entitled to demand proof that Weaver's Cove's proposed upland disposal facility will accept it. Of course, this is not a barge to nowhere situation, because Weaver's Cove has identified a disposal site subject to the jurisdiction of other agencies that play a role under the CZMA.

section 3009.(C)(7) of the CRMP, and complementary regulatory schemes to the extent they shed light on its meaning.

It is true, as CRMC points out, that federal agency interpretations of their own regulations (when authorized by Congress) are "controlling unless 'plainly erroneous or inconsistent with the regulation.'" Auer v. Robbins, 519 U.S. 452, 461 (1997) (quoting Robertson v. Methow Valley Citizens Council, 490 U.S. 332, 359 (1989)). However, even if we applied that standard here, CRMC cannot satisfy it because the plain language of section 300.9(C)(7) of the CRMP calls for "approved upland facilities" (emphasis added). Thus, even if upland facilities can be interpreted to include facilities outside of Rhode Island, CRMC has not pointed to any regulatory scheme that deals with the approval of out-of-state facilities or even a list of approved out-of-state facilities. The only regulatory scheme for approving upland facilities is that administered by RIDEM, and CRMC's interpretation of its regulation is therefore clearly erroneous.[10]

This construction of state law also permits us to avoid an issue of whether a different construction would violate federal law. As noted, see supra note 1, an individual state may not

---

[10]  We also reject CRMC's argument that it deserves deference under Mountain Rhythm Resources v. Fed. Energy Regulatory Comm'n, 302 F.3d 958 (9th Cir. 2009). That case involved review of a federal agency's decision to adopt a state's interpretation of its coastal management plan under the arbitrary and capricious standard. Id. at 966. Here we are reviewing the state agency's interpretation itself.

purport to undertake out of state regulation for consistency review purposes without getting NOAA's consent. 15 C.F.R. § 930.154(e).

C.    Preemption of State Category B Assent to Dredging by Section 3 of the Natural Gas Act and by FERC's Conditional Approval

We review the district court's finding that CRMC's state law licensing program for coastal dredging, the Category B Assent process, is preempted by the NGA, at least on the facts here. At stake is whether CRMC may still delay the project based on Weaver's Cove's failure to satisfy section 300.9(C)(7) of the CRMP or other CRMP requirements, despite our conclusion that concurrence in Weaver's Cove's consistency certification should be presumed. Our standard when reviewing a district court's finding of preemption is de novo. Fitzgerald v. Harris, 549 F.3d 46, 52 (1st Cir. 2008); SPGGC, LLC v. Ayotte, 488 F.3d 525, 530 (1st Cir. 2007).

While the district court found the Category B Assent process preempted on a number of grounds, Weaver's Cove, 583 F. Supp. 2d at 279-85, we affirm for the narrowest reason, that of conflict preemption.

In its order, FERC analyzed Weaver's Cove's proposed dredging activities in both Rhode Island and Massachusetts, assessed the environmental impact the dredging would have and compared it with alternatives, and analyzed the effect on the water and wildlife, land use, recreation, ship traffic, and air quality. Weaver's Cove Energy, LLC, 112 F.E.R.C. at ¶ 61,540 (discussing

-29-

environmental issues reviewed and adopting the findings of FERC's Final Environmental Impact Statement ("FEIS")); Office of Energy Projects, Fed. Energy Regulatory Comm'n, Docket No. CP04-36-000, Weaver's Cove LNG Project Final Environmental Impact Statement (May 2005) [hereinafter "Weaver's Cove FEIS"]. Further, FERC concluded that the dredging was part of the construction and operation of the terminal project. Thus, Category B Assent clearly conflicts with FERC's "exclusive authority," as exercised here, to license the "siting, construction, expansion, or operation" of LNG terminals. 15 U.S.C. § 717b(e)(1).[11]

To simplify a complex area of law, preemption arguments are generally divided into three categories. Fitzgerald, 549 F.3d at 52. The first, express preemption, results from language in a statute revealing an explicit congressional intent to preempt state law. Barnett Bank of Marion County, N.A. v. Nelson, 517 U.S. 25, 31 (1996). The second, field preemption, is that Congress may implicitly preempt a state law by creating a pervasive scheme of regulation. Fitzgerald, 549 F.3d at 52; N. Natural Gas Co. v. Iowa Utils. Bd., 377 F.3d 817, 823 (8th Cir. 2004) (holding a state's

_____

[11] This provision of the NGA was not in effect until August 8, 2005, after FERC issued its order on July 15, 2005. However, FERC's interpretation of its own preemptive authority under the NGA to regulate construction of LNG facilities was clearly articulated before this provision came into force. Weaver's Cove Energy, LLC, 112 F.E.R.C. at ¶ 61,546. Further, FERC reaffirmed its approval of Weaver's Cove's application after the provision became effective. Weaver's Cove Energy, LLC, 114 F.E.R.C. at ¶ 61,185-86.

site-specific environmental review field preempted because FERC has authority under the NGA to consider environmental issues).  The third category is conflict preemption.  In this category, state law is "pre-empted to the extent it actually conflicts with federal law, that is, when compliance with both state and federal law is impossible, or when the state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress."  Id. at 53 (quoting Good v. Altria Group, Inc., 501 F.3d 29, 47 (1st Cir. 2007)).

Weaver's Cove asks us to find preemption under the first two grounds.  It also stresses the district court's application of a field preemption test set forth in a NGA preemption case. Weaver's Cove, 583 F. Supp. 2d at 285 (citing Schneidewind, 485 U.S. at 301).

We prefer to decide on the narrowest grounds: conflict preemption.  In this case, FERC has interpreted the dredging activities in the Weaver's Cove's project, including those in Rhode Island, to be within its preemptive jurisdiction.  See Fitzgerald, 549 F.3d at 55 ("The proposition that federal agency action, taken pursuant to its interpretation of a statute, may itself preempt is quite correct.").  CRMC does not argue that the proposed dredging is not a part of the LNG terminal's "siting, construction, . . . or operation" under 15 U.S.C. § 717b(e)(1), although Massachusetts, as

-31-

amicus, does.[12]  In its original order, FERC extensively reviewed the dredging as part of the overall terminal construction and operational plan.  Weaver's Cove Energy, LLC, 112 F.E.R.C. at ¶ 61,535-36, 61,545, 61,550.  Here, FERC carefully reviewed the very dredging Rhode Island seeks to further regulate and, after considering environmental impacts, authorized the project.  Id. at 61,546.  The FEIS, adopted by reference in the FERC order, id. at 61,540, found that the dredging was necessary "to accommodate the passage of LNG ships" to the facility, Weaver's Cove FEIS, at 2-25 (May 2005), and that it would be impossible to "reduce the volume or extent of dredging and still satisfy the objectives of the project at the proposed site," id. at 3-70.  Thus, FERC concluded that the dredging was part of the construction and the operation of the terminal facility.  That ruling is final and binding because no objections were made to FERC's findings on these points in the parties' request for rehearing.[13]  Further, the dredging is in an approved federal navigation channel.

---

[12]    Rather CRMC argues that Section 10 of the River and Harbors Act saves Category B Assent from preemption by the NGA, a contention we consider below.

[13]    The parties never raised objections to these findings in their request for rehearing to FERC and thus courts have no jurisdiction to review this determination by FERC.  15 U.S.C. § 717r(a) ("No proceeding to review any order of the Commission shall be brought by any person unless such person shall have made application to the Commission for a rehearing thereon.").

By finding the dredging activities were part of the construction and operation of the terminal facility, FERC has interpreted the Rhode Island dredging at issue in this case to be within its jurisdiction. Thus, the Category B Assent process utilized by Rhode Island clearly collides with FERC's delegated authority and is preempted. FERC made this clear in its order regarding Weaver's Cove's application, which stated that state agencies could not use state law to "prohibit or unreasonably delay the construction or operation of facilities approved by this Commission." Weaver's Cove Energy, LLC, 112 F.E.R.C. at ¶ 61,546. FERC affirmed this point on rehearing, in response to the City of Fall River's challenge. Weaver's Cove Energy, LLC, 114 F.E.R.C. at ¶ 61,185-86.

CRMC's handling of the Category B Assent process both conflicts with and is an obstacle to the authority FERC has asserted in this case. Unlike CZMA consistency review, which allows the CRMC to review the dredging proposals, limited by a six-month deadline and administrative and federal judicial review, the Category B Assent process contains no such limitations, and to this date the appellant has not processed this application or reached any decision on the merits. CRMC has taken the position that it must carry out the Category B Assent process concurrently with the consistency review, and because the consistency review has not commenced, it cannot address the application for Category B Assent.

-33-

Thus, even if concurrence were presumed, CRMC's position is that the Category B Assent process would itself independently block full licensing of the facility. This is clearly an application of state law that delays or has the potential to prohibit the ultimate licensing and construction of the LNG terminal. Weaver's Cove Energy, LLC, 112 F.E.R.C. at ¶ 61,546. Further, CRMC's two bites at the apple approach necessarily conflicts with the federal process for and interest in defining what is necessary data. Because CRMC's actions here conflict with FERC's jurisdiction and the limits for consistency review, it is preempted.[14]

_____

[14] CRMC and Massachusetts also incorrectly argue that the district court based its Category B Assent preemption on the doctrine of federal navigational servitude and that a finding of preemption under the servitude was improper because Congress failed to invoke it expressly within the NGA. The argument misreads the district court's holding and is irrelevant. Congress's power to preempt state regulation here emanates not only from its power to regulate navigation but also from its power to regulate commerce itself. U.S. Const. art. I, § 8, cl. 3; 43 U.S.C. § 1314(a) ("The United States retains all its navigational servitude and rights in and powers of regulation and control of said lands and navigable waters for the constitutional purposes of commerce, [and] navigation . . . ."); see also First Iowa Hydro-Elec. Coop. v. Federal Power Com., 328 U.S. 152, 182 (1946) ("The states possess control of the waters within their borders, 'subject to the acknowledged jurisdiction of the United States under the Constitution in regard to commerce and the navigation of the waters of rivers.'" (quoting United States v. Appalachian Elec. Power Co., 311 U.S. 377, 404 (1940)).
    In its reply brief, CRMC raises a new argument that while Congress could preempt commercial regulation under the Commerce Clause, it could not displace Rhode Island's property rights without invoking the navigational servitude doctrine. Because arguments raised for the first time in reply briefs are procedurally barred, we need not consider this contention. United States v. Hall, 557 F.3d 15, 20 n.3 (1st Cir. 2009). In any event, the argument is wrong. The Supreme Court has held that state

D.        Rivers and Harbors Act

Finally, CRMC argues that the federal Rivers and Harbors Act saves its state Category B Assent process from preemption. Pointing to language in the NGA qualifying FERC's exclusive authority to the extent that it affects law "related to" the authority of other federal agencies, 15 U.S.C. § 717b(e)(1), CRMC argues that the NGA preserves not only the Army Corps's role in approving dredging activities but also the entire body of law "related to" that role.  Since the Army Corps's approval process under the Rivers and Harbors Act does not preempt state licensing schemes, CRMC argues that the savings clause in the NGA must therefore protect Category B Assent.

These arguments, assuming arguendo they were preserved in the district court, are meritless.  The language of § 717(b)(e)(1) is plainly aimed at preserving the authority of federal agencies and not that of state agencies like CRMC.  CRMC's argument that its state licensing program is "related to" the authority of FERC is also untenable.  As CRMC points out in other parts of its brief, CRMC's authority to require Category B Assent derives from Rhode Island's status as a sovereign, whereas the Army Corps's authority derives from the federal government.  The fact that the Rivers and

property interests in land may not preempt federal statutes enacted pursuant to the Commerce Clause.  Douglas v. Seacoast Prods., Inc., 431 U.S. 265, 283-84 (1977).

Harbors Act does not itself preempt Category B Assent is therefore irrelevant to the NGA's preemptive effect.

Under its exclusive authority, FERC considers the dredging in Rhode Island to be a part of the LNG construction. FERC, as required by the NGA, has provided CRMC an opportunity to review the project through CZMA consistency review. CRMC cannot now avoid presumed concurrence by relying on a nearly identical state law licensing procedure.

The district court's judgment is <u>affirmed</u>.